# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE,          )

                                    )

        v.                 )      Cr. I.D. No. 9904019329

                                    )

LUIS REYES,                )

                                    )

        Defendant.      )


Final Submission: November 24, 2015
Decided: January 27, 2016

***Upon Defendant's Motion for Postconviction Relief***
**GRANTED**

**<u>MEMORANDUM OPINION</u>**


Patrick J. Collins, Esquire, Collins & Associates, Wilmington, DE, Attorney for Defendant.

Elizabeth R. McFarlan, Esquire, and Maria T. Knoll, Esquire, Department of Justice, Wilmington, DE, Attorneys for the State of Delaware.


**Rocanelli, J.**

# I. INTRODUCTION AND PROCEDURAL HISTORY

The bodies of Brandon Saunders and Vaughn Rowe were discovered in a wooded area of Rockford Park in Wilmington, Delaware, on January 21, 1996. Nearly four years later, on December 6, 1999, Luis Reyes ("Reyes") and Luis Cabrera ("Cabrera") were indicted as co-defendants for the murders of Saunders and Rowe ("Rockford Park Murders").[1] The State sought the death penalty for both Reyes and Cabrera in connection with the Rockford Park Murders. Counsel was appointed for both defendants.[2] The trials of Cabrera and Reyes were severed by the Trial Court.[3]

## A. Reyes Rockford Park Trial and Direct Appeal

Cabrera was tried first and convicted of all counts by a jury, which recommended by a vote of 11–1 that the death sentence be imposed. Reyes' trial for the Rockford Park Murders took place thereafter ("Reyes Rockford Park Trial"): jury selection started on September 18, 2001; the guilt phase began on October 2, 2001; jury deliberations began on October 18, 2001; and, on October 19, 2001, the jury returned a verdict finding Reyes guilty of two counts of First

---

[1] At the time they were indicted for the murders of Rowe and Saunders, Reyes and Cabrera were serving sentences imposed for the January 1995 murder of Fundador Otero. Cabrera was serving a life sentence for Murder First Degree. Reyes was serving a twenty-year sentence for Murder Second Degree (Level V time suspended after twelve years for decreasing levels of community-based supervision).

[2] "Reyes Trial Counsel" was Jerome M. Capone, Esquire, and Thomas A. Pedersen, Esquire. Reyes Trial Counsel also represented Reyes on direct appeal.

[3] The "Trial Court" refers to the presiding judge to whom this case was assigned until September 2013.

Degree Murder, two counts of Possession of a Firearm During the Commission of a Felony, and two counts of Conspiracy in the First Degree.

During the guilt phase, Reyes moved for a mistrial on grounds of juror misconduct. The Trial Court denied the motion, concluding that the jurors were able to continue in an unbiased manner. The penalty phase began on October 23, 2001, and ended on October 26, 2001. The jury recommended that Reyes receive the death sentence for each of the two murders by a vote of 9-3. By decision and Order dated March 14, 2002, the Trial Court sentenced both Reyes and Cabrera to death.[4]

An automatic, direct appeal was filed with the Delaware Supreme Court,[5] which addressed several issues: (i) the Trial Court's denial of individual *voir dire* during jury selection; (ii) the admission into evidence of Reyes' testimony during cross-examination in the Otero trial;[6] (iii) the admission into evidence of two statements attributed to co-defendant Cabrera; (iv) the admission into evidence of testimony about the victims' state of mind on the night of the Rockford Park Murders; (v) alleged juror misconduct; (vi) whether jury deliberations were tainted by consideration of information not in evidence; (vii) the constitutionality of the

---

[4] *State v. Cabrera*, 2002 WL 484641, at \*5–8 (Del. Super. Mar. 14, 2002) *aff'd and remanded sub nom Reyes v. State*, 819 A.2d 305 (Del. 2003) (hereinafter *Reyes Sentencing*).

[5] *See* 11 *Del. C.* § 4209(g) ("Whenever the death penalty is imposed, and upon the judgment becoming final in the trial court, the recommendation on and imposition of that penalty shall be reviewed on the record by the Delaware Supreme Court."); Reyes' direct appeal to the Delaware Supreme Court was filed on March 21, 2002.

[6] *See supra* n.1.

1991 Delaware Death Penalty Statute; and (viii) an independent review of the death sentence, including statutory aggravators, and whether the imposition of the death penalty was arbitrary or capricious. The Supreme Court affirmed Reyes' convictions and death sentences by Opinion and Order dated March 25, 2003.[7]

## B. Appointment of Rule 61 Counsel and Postconviction Motions

By letter dated March 8, 2004, Reyes notified the Trial Court that Reyes intended to pursue postconviction relief and requested appointment of counsel. The Trial Court appointed counsel to represent Reyes in the postconviction proceedings ("Rule 61 Counsel").[8] Reyes' Rule 61 motion filed in March 2004—amended in 2005, 2007, in 2009, and as briefed in 2014, and 2015—is now pending before this Court for decision.[9]

---

[7] *Reyes v. State*, 819 A.2d 305 (Del. 2003) (hereinafter *Reyes Direct Appeal*).

[8] Various lawyers have been appointed to Reyes since 2004: first, Kevin J. O'Connell, Esquire and Jan T. Van Amerongen, Esquire; second, Jan T. Van Amerongen, Esquire and Andrew J. Witherell, Esquire; third, Jan T. Van Amerongen, Esquire and Joseph Gabay, Esquire; fourth, Jan T. Van Amerongen, Esquire and Jennifer-Kate Aaronson, Esquire; fifth, Jennifer-Kate Aaronson, Esquire; sixth Jennifer-Kate Aaronson, Esquire and Michael Modica, Esquire; seventh, Jennifer-Kate Aaronson, Esquire and Natalie Woloshin, Esquire; eighth, Natalie Woloshin, Esquire and Patrick J. Collins, Esquire; ninth, Patrick J. Collins, Esquire and Albert J. Roop, V, Esquire; and tenth, Patrick J. Collins, Esquire.

[9] On March 19, 2004, Reyes filed his first motion for postconviction relief. On April 28, 2005, Reyes filed a supplemented motion for postconviction relief. On March 16, 2007, Reyes filed an amended motion for postconviction relief. On October 13, 2009, Reyes filed a second amended motion for postconviction relief. On April 1, 2013, the Trial Court began an evidentiary hearing pursuant to Superior Court Criminal Rule 61(h). The Trial Court held evidentiary hearings in May and August 2012 and April 2013. The presiding judge retired from the Superior Court in May 2013. The matter was reassigned by then-President Judge Vaughn in September 2013. Reyes filed a post-evidentiary hearing brief on April 30, 2014. The State filed a response on October 7, 2014. Reyes replied on November 10, 2014. On January 29, 2015, this Court entered an Order staying Reyes' postconviction proceedings pending the outcome of Cabrera's postconviction proceedings. On June 17, 2015, this Court issued its decision with respect to

3

There was little physical evidence presented at the Reyes Rockford Park Trial that connected Reyes to the Rockford Park Murders. Rather, most of the evidence presented at the Reyes Rockford Park Trial tied Cabrera to the Rockford Park Murders. With little physical evidence linking Reyes to the Rockford Park Murders and with the possibility of a sentence of death, it was essential to a fair trial and sentencing that Reyes Trial Counsel use all available evidence and "make timely and appropriate objections to the admission of evidence going to the heart of the State's case."[10] Therefore, it was especially important that Reyes Trial Counsel use all available exculpatory evidence and make appropriate objections to challenge the State's minimal case. This Court's review of the record leads the Court to conclude that mistakes were made that undermine this Court's confidence in the Reyes Rockford Park Trial conviction and sentencing.

First, Reyes' decision to invoke his Fifth Amendment right during the guilt phase was not knowing, intelligent, and voluntary. Second, the Trial Court's delay in sentencing Cabrera rendered Cabrera unavailable as a witness in the Reyes Rockford Park Trial, denying access to important exculpatory evidence. Third, the testimony of Roderick Sterling was the most significant evidence against Reyes; however, it was highly suspect and because Sterling did not have personal

---

Cabrera's motion for postconviction relief and issued a revised opinion on June 22, 2015. The Court requested supplemental briefing, which was submitted on August 24, 2015, November 6, 2015, and November 24, 2015.

[10] *Starling v. State*, 2015 WL 8758197, at *1 (Del. 2015).

4

knowledge of the claims he made, Reyes was deprived of his Sixth Amendment Right to Confrontation. Fourth, Reyes has established various claims of ineffective assistance of counsel in both the guilt and penalty phases of the Reyes Rockford Park Trial that cumulatively prejudiced Reyes.

There is a reasonable probability that the outcome of the Reyes Rockford Park Trial verdict and sentencing would have been different absent these errors. Therefore, Reyes' judgments of conviction and death sentence imposed by Order dated March 14, 2002 must be vacated.

## II. CONSIDERATION OF PROCEDURAL BARS

Superior Court Criminal Rule 61 governs Reyes' motion for postconviction relief.[11] Postconviction relief is a "collateral remedy which provides an avenue for upsetting judgments that have otherwise become final."[12] To protect the finality of criminal convictions, the Court must consider the procedural requirements for relief set out under Rule 61(i) before addressing the merits of the motion.[13]

Rule 61(i)(1) bars a motion for postconviction relief if it is filed more than three years from the final judgment; this bar is not applicable as Reyes' first postconviction motion was filed in a timely manner.[14] Rule 61(i)(2) bars

---

[11] Super. Ct. Crim. R. 61 has since been amended. All references to Rule 61 refer to the version of the Rule in place in 2004, when Reyes filed his motion for postconviction relief.

[12] *Flamer v. State*, 585 A.2d 736, 745 (Del. 1990).

[13] *Younger v. State*, 580 A.2d 552, 554 (Del. 1990).

[14] Rule 61(i)(1) (barring a motion for postconviction relief unless filed within three years after the judgment of conviction is final); *Bailey v. State*, 588 A.2d 1121, 1127 (Del. 1991).

successive postconviction motions;[15] this bar is not applicable as Reyes has not filed successive postconviction motions. Rule 61(i)(3) bars relief if the motion includes claims not asserted in prior proceedings leading to the final judgment; this bar will be addressed in the discussion of the claims to which it applies. Rule 61(i)(4) bars relief if the motion includes grounds for relief formerly adjudicated in any proceeding leading to the judgment of conviction, in an appeal, or in a postconviction proceeding; this bar will be addressed in the discussion of the claims to which it applies.

This Court rejects the State's contention that certain claims set forth in the pending Rule 61 Motion should not be considered because those claims were not presented in prior Rule 61 Motions. This is Reyes' *first* Rule 61 Motion because the prior motions were not adjudicated. Moreover, the Trial Court allowed postconviction evidentiary hearings that further developed the record. There have been numerous changes in Reyes' postconviction counsel since Reyes first filed his Rule 61 Motion in 2004. The Trial Court permitted successive, amended, and supplemental motions to be filed on Reyes' behalf. To consider claims barred after the Court permitted amendments and supplements would render the expanded record superfluous, Rule 61 Counsel's efforts futile, and would violate Reyes' rights to full and fair consideration of whether Reyes' death penalty trial and

---

[15] Super. Ct. Crim. R. 61(i)(2) (barring successive postconviction motions if the motion includes grounds for relief not asserted in a prior postconviction proceeding).

6

sentencing was conducted in a manner consistent with Reyes' due process rights. Accordingly, this Court will consider the claims presented in the briefing without regard to whether claims were presented in Rule 61 motions were not adjudicated.

The procedural bars to postconviction relief under Rule 61(i)(3)[16] can be overcome if the motion asserts a colorable claim that there has been a "miscarriage of justice" as the result of a constitutional violation that undermined the fundamental fairness of the proceedings.[17] Likewise, the procedural bar under Rule 61(i)(4)[18] can be overcome if consideration of the claim on its merits is warranted in the "interest of justice."[19]

Finally, Reyes' postconviction motion asserts multiple claims of constitutional violations, including claims of ineffective assistance of counsel. The Delaware Supreme Court has declined to hear claims of ineffective assistance of counsel on direct appeal.[20] Therefore, the first opportunity for Reyes to assert such claims is in an application for postconviction relief.

---

[16] This exception is also applicable to procedural bars to postconviction relief under Rule 61 (i)(1) and (2), but those bars are not relevant here.
[17] Super. Ct. Crim. R. 61(i)(5); *see also Younger*, 580 A.2d at 555; *State v. Wilson*, 2005 WL 3006781, at *1 n.6 (Del. Super. Nov. 8, 2005).
[18] This exception is also applicable to procedural bars to postconviction relief under Rule 61 (i)(2), but that bar is not relevant here.
[19] Super. Ct. Crim. R. 61(i)(5).
[20] *Flamer*, 585 A.2d at 753; *State v. Gattis*, 1995 WL 790961, at *3 (Del. Super. Dec. 28, 1995).

## III. THERE ARE COLORABLE CLAIMS OF MISCARRIAGE OF JUSTICE IN THE REYES ROCKFORD PARK TRIAL.

Pursuant to Rule 61(i)(5), procedural bars to postconviction claims are not applicable to a "colorable claim that there was a miscarriage of justice because of a constitutional violation that undermined the fundamental legality, reliability, integrity or fairness of the proceedings leading to the judgment of conviction."[21] Not every constitutional violation merits relief under the "miscarriage of justice" exception.[22] Rather, a criminal defendant must establish a colorable claim of a constitutional violation, which requires the criminal defendant show "some credible evidence which takes the claim past the frivolous state."[23]

Moreover, pursuant to Rule 61(i)(4), the Court must address any postconviction claim that has been formerly adjudicated if "reconsideration is warranted in the interest of justice." A criminal defendant may trigger the interest of justice exception by presenting legal or factual developments that have emerged subsequent to the conviction.[24] The interest of justice exception is narrow in scope; however, the Court must also preserve the purpose of Rule 61(i) procedural bars: achieving finality of judgments.[25]

---

[21] Super. Ct. Crim. R. 61(i)(5).
[22] *See Webster v. State*, 604 A.2d 1364, 1366 (Del. 1992).
[23] *State v. Ducote*, 2011 WL 7063381, at *1 n. 4 (Del. Super. Dec. 29, 2011) (citing *State v. Wharton*, 1991 WL 138417, at *5 (Del. Super. June 3, 1991)).
[24] *Flamer*, 585 A.2d at 746; *Weedon v. State*, 750 A.2d 521, 527 (Del. 2000) (discussing witness recantation as a factual development for purposes of the exception).
[25] *State v. Rosa*, 1992 WL 302295, at *7 n.10 (Del. Super. Sept. 29, 1992).

Upon consideration of the entire record, this Court finds there was a miscarriage of justice pursuant to Rule 61(i)(5), that reconsideration of otherwise procedurally barred claims is warranted in the interest of justice pursuant to Rule 61(i)(4). Legal developments have emerged subsequent to the convictions, Reyes was deprived of his constitutional rights, and the integrity of the Reyes Rockford Park Trial was compromised.

## A. Reyes' Fifth Amendment rights were violated.

### 1. Reyes' decision to invoke his Fifth Amendment right at the guilt phase was not knowing, intelligent, and voluntary.

The decision of whether or not to testify is a fundamental right.[26] In making that decision, Reyes should have had the opportunity to consider that evidence regarding his involvement with the Otero murder would be admitted during the penalty phase as an aggravating factor. In his allocution during the penalty phase of the Reyes Rockford Park Trial, Reyes professed his innocence. Specifically, Reyes stated: "[O]n everything that I love and on the Word of God, I did not kill Brandon and Vaughn. I did not take their life. No matter how bad things may look, the evidence that was presented, I'm not the murderer of them two."[27] Reyes explained to the jury that he had wanted to testify to profess his

---

[26] *See* U.S. CONST. amend. V; DEL. CONST. art. 1, § 7.
[27] Penalty Phase Tr. Oct. 25, 2001 at 94:20-95:1.

9

innocence during the guilt phase, but he did not do so because Reyes did not want the jury to hear about Reyes' role in the Otero murder.[28]

A criminal defendant alone must make the fundamental decision whether to testify on his own behalf.[29] The decision regarding whether to testify must be made by a criminal defendant and cannot be made by defense counsel[30] because such a choice "implicate[s] inherently personal rights which would call into question the fundamental fairness of the trial if made by anyone other than the defendant."[31] Furthermore, waiver of the right to testify on one's own behalf must be knowing, intelligent, and voluntary.[32] Whether a waiver of a constitutional right is knowing, intelligent, and voluntary depends upon the facts and circumstances of each case.[33] A waiver of a constitutional right is knowing, intelligent, and voluntary "if the defendant is aware of the right in question and the likely consequences of deciding to forego that right."[34]

Although the Trial Court conducted an appropriate colloquy with Reyes and Reyes stated in open court that his decision was voluntary and not a product of a

---

[28] *Id.* at 96:3-11.
[29] *Jones v. Barnes*, 463 U.S. 745, 751 (1983); *United States v. Lively*, 817 F. Supp. 453, 461 (D. Del. 1993) *aff'd*, 14 F.3d 50 (3d Cir. 1993); *Taylor v. State*, 28 A.3d 399, 406 (Del. 2011).
[30] *Lively*, 817 F. Supp. at 461.
[31] *Cooke v. State*, 977 A.2d 803, 841 (Del. 2009) (internal citations omitted).
[32] *See Hall v. State*, 408 A.2d 287, 288 (Del. 1979); *see also State v. Taye*, 2014 WL 785033, at *5 (Del. Super. Feb. 26, 2014) *aff'd*, 2014 WL 4657310 (Del. Sept. 18, 2014).
[33] *Lewis v. State*, 757 A.2d 709, 714 (Del. 2000).
[34] *Davis v. State*, 809 A.2d 565, 569 (Del. 2002); *Richardson v. State*, 2015 WL 5601959, at *2 (Del. Super. Sept. 22, 2015).

threat or promise,[35] Reyes' waiver of his right to testify was predicated on the mistaken understanding that, if he did not testify, then information regarding his involvement in the Otero murder would not be presented to the jury. During his allocution, Reyes explained: "I didn't get on the stand during trial because I didn't want what I was presently incarcerated for to come up. I felt that by that coming out, you, the jury, would automatically think I was guilty. Therefore, I chose not to take the stand."[36]

Despite this very significant step taken by Reyes, *i.e.* not testifying in his own defense to profess his innocence, the jury heard about the Otero murder in great detail—not only from the State, but also from Reyes' own lawyers. For example, during the penalty phase, the State started its opening statement with a photograph of Otero and told the jury that the Rockford Park Murders were not the first time that Reyes had committed murder. The Otero murder was the central focus of the State's arguments in favor of death. In addition, Reyes Trial Counsel introduced the transcript from Reyes' sentencing for the Otero murder. Highlighting the prior murder, in introducing the transcript to the jury,[37] Reyes Trial Counsel stated:

---

[35] Guilt Phase Tr. Oct. 16, 2001 at 19:1-21:14.

[36] Penalty Phase Tr. Oct. 25, 2001 at 96:3-8.

[37] The transcript included statements from Reyes' Otero trial counsel that Reyes only participated in the Otero murder because of Cabrera's influence and that Reyes cooperated in the investigation of Cabrera for the Otero murder. *Id.* at 6:21-7:17. The transcript also included statements from Reyes' Otero counsel and the State that Reyes, after learning that the police

11

I'm going to skip the niceties. I'm going to get right to the heart of the matter and I want to tell you that this—and I'm going to tell you that this is the sentencing transcript of September 25th, 1988 of Luis Reyes who was being sentenced on a murder second charge for the murder of Fundador Otero.[38]

While it appears that Reyes understood the right that he waived in waiving his right to testify on his own behalf, Reyes did not understand the consequences of choosing to forego that right. Reyes' explanation to the jury during the sentencing phase of the Reyes Rockford Park Trial that he wanted to testify to profess his innocence during the guilt phase, but did not do so to avoid presentation to the jury about Reyes' role in the Otero murder shows that Reyes' expectation was that such evidence would not be admitted, including by Reyes Trial Counsel. In making the decision not to testify, Reyes should have had the opportunity to consider that evidence regarding his involvement with the Otero murder would be admitted during the penalty phase as an aggravating factor.

Accordingly, Reyes' decision was not knowing or intelligent because it was premised on a misunderstanding. The introduction of evidence about Otero

---

were looking for him, turned himself in, and gave a detailed confession to the murder of Otero. *Id.* at 7:11-13; 9:23-10:2. The transcript included the State's reference to the "wrenching" testimony of Otero's daughter who dreamed of walking down the aisle with her father, the fact that Otero's "charred remains" were found in New Jersey, and that Reyes "physically was a principal in the murder by holding down Mr. Otero." *Id.* at 10:22-11:20. The transcript also included Reyes' statement to the Otero sentencing judge, in which Reyes conceded that Cabrera's influence over Reyes did not justify Reyes' actions, but that Reyes allowed his love for Cabrera to lead him in the wrong direction and that Reyes regrets that every day. *See id.* at 14:12-15:8.

[38] *Id.* at 4:21-5:4.

coupled with Reyes' expectation that such evidence would not be introduced seriously undermines whether Reyes' decision was knowing, intelligent, and voluntary.

**2. The State's presentation of Reyes' prior testimony from another proceeding undermined Reyes' decision to invoke his Fifth Amendment right not to testify.**

When Reyes was interviewed by police regarding the Otero murder, Reyes told police that he made a statement to his girlfriend/fiancé, Elaine Santos, that one night Reyes was with Cabrera, someone came to Reyes' house, and Cabrera and Reyes went to the basement to beat him up. As part of Reyes' plea agreement in the Otero murder, Reyes agreed to testify as a witness against Cabrera in Cabrera's Otero murder trial in 1998. During Cabrera's Otero murder trial, the State questioned Reyes about his statement to Ms. Santos and Reyes admitted that he lied to Ms. Santos. Subsequently, during the guilt phase of the Reyes Rockford Park Trial, the State read into evidence (with a detective on the witness stand) this part of Reyes' trial testimony from Cabrera's Otero murder trial.[39] It appears the State's purpose in introducing this testimony was twofold: (1) to suggest that the beating involved Saunders and Rowe and had taken place on the night of the Rockford Park Murders; and (2) to suggest to the jury that Reyes is a liar.

---

[39] *See* Guilt Phase Tr. Oct. 2, 2001 at 241:22-242:14 (reading into evidence Reyes' trial testimony dated May 26, 1998, Exhibit 42 in the Reyes Rockford Park Trial).

13

This was improper and objectionable. Although Reyes Trial Counsel objected to the reading in of Reyes' prior testimony,[40] the Trial Court permitted Reyes' prior testimony to be read to the jury in the Reyes Rockford Park Trial. The Trial Court simply explained that the testimony was probative and determined there was no Delaware Rule of Evidence ("DRE") "403 issue that prohibit[ed] its admission."[41] However, Reyes' former testimony was nevertheless inadmissible hearsay and undermined Reyes' choice to invoke his Fifth Amendment right not to testify.

"Evidence of a person's character or a trait of his character is not admissible for the purpose of proving action in conformity therewith on a particular occasion."[42] However, an exception to this rule includes "[e]vidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same."[43] Moreover, a witness' credibility may be impeached by evidence in the form of reputation or opinion.[44] Generally, a witness' credibility may not be impeached with extrinsic evidence of a specific instance of conduct.[45] However, in the discretion of the Court, a specific instance of conduct related to the witness'

---

[40] Reyes Trial Counsel objected to Reyes' prior testimony at a pre-trial conference and during the guilt phase of the Reyes Rockford Park Trial. *See* Pre Trial Conf. Tr. Sept. 27, 2001 at 34:19-53:16; Guilt Phase Tr. Oct. 2, 2001 at 230:17-233:11.

[41] Pre Trial Conf. Tr. Sept. 27, 2001 at 49:13-50:11.

[42] D.R.E. 404(a).

[43] D.R.E. 404(a)(1).

[44] D.R.E. 608(a).

[45] D.R.E. 608(b).

credibility may be "inquired into on cross-examination of the witness" if it concerns "the witness' character for truthfulness or untruthfulness" or it concerns "the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified."[46]

There is nothing in the record that suggests that Reyes Trial Counsel introduced evidence regarding the character trait for truthfulness or untruthfulness for Saunders, Rowe, or Reyes. Further, Reyes' testimony that was introduced was neither opinion nor reputation evidence as permitted under the DRE. Instead, it was a specific instance of conduct, which is inadmissible in the form of extrinsic evidence and can only be inquired into on cross-examination. Accordingly, evidence of Reyes' character trait for truthfulness was inadmissible because he was not a witness in the Reyes Rockford Park Trial because he invoked his Fifth Amendment right, and his character for truthfulness was not otherwise attacked. Moreover, even if Reyes' character for truthfulness was at issue, extrinsic evidence—the reading of the testimony into evidence and introducing it as an exhibit—was inadmissible under the DRE. Presentation of Reyes' own testimony from a prior proceeding undermined Reyes' decision not to testify as a witness against himself.

---

[46] *Id.*

**B. Cabrera was unavailable as a witness in the Reyes Rockford Park Trial because Cabrera was not promptly sentenced after his conviction.**

Cabrera's trial for the Rockford Park Murders took place in early 2001. The jury returned a verdict on February 11, 2001, finding Cabrera guilty of two counts of First Degree Murder, two counts of Conspiracy in the First Degree, and other offenses. The Cabrera penalty phase began on February 13, 2001, and ended on February 15, 2001. The jury recommended that Cabrera receive the death sentence for each of the Rockford Park Murders by a vote of 11–1. The Court postponed Cabrera's sentencing until the completion of the Reyes Rockford Park Trial. Ten months later, Reyes was convicted on October 19, 2001, and on October 26, 2001, the jury recommended that Reyes receive the death sentence for each of the Rockford Park Murders by a vote of 9–3. By decision and Order dated March 14, 2002, the Trial Court sentenced both Cabrera and Reyes to death.[47]

Although Cabrera's trial concluded more than eight months before the Reyes Rockford Park Trial, Cabrera had not been sentenced by the Trial Court at the time of Reyes' trial. Indeed, the Cabrera death sentence was imposed more than thirteen months after the jury recommended a death sentence for Cabrera. Because his sentencing was still pending, Cabrera was unavailable as a witness at the Reyes Rockford Park Trial.[48]

---

[47] *Reyes Sentencing*, 2002 WL 484641, at *5–8.
[48] *Cabrera v. State*, 840 A.2d 1256, 1267 (Del. 2004) (hereinafter *Cabrera Direct Appeal*).

16

Had Cabrera testified as a witness at the Reyes Rockford Park Trial, Cabrera may have introduced reasonable doubt regarding Reyes' role in the Rockford Park Murders. Specifically, Reyes Trial Counsel met with Cabrera in March 2001 and Cabrera explained to Reyes Trial Counsel that *Reyes was not responsible for the Rockford Park Murders*, but instead that a man named Neil Walker had committed the murders. Cabrera detailed an altercation that involved Walker, Cabrera, Saunders, and Rowe that gave a motive for Walker to commit the Rockford Park Murders.

However, instead of testifying on behalf of Reyes, Cabrera advised that, if called as a witness in the Reyes Rockford Park Trial, Cabrera would invoke his Fifth Amendment right because he had not yet been sentenced.[49] Accordingly, a critical witness with exculpatory evidence for Reyes was unavailable because of the Trial Court's exercise of discretion as to the timing of Cabrera's sentencing. The Trial Court's delay in sentencing Cabrera rendered Cabrera unavailable as a witness in the Reyes Rockford Park Trial, denying access to exculpatory evidence and undermining the fairness of the trial.

---

[49] *See* Letter from John P. Deckers to Luis Cabrera, March 6, 2001; Letter from Luis Cabrera to Reyes Trial Counsel, Sept. 23, 2001; Letter from John P. Deckers to Reyes Trial Counsel, Oct. 9, 2001.

**C. The testimony offered by Sterling was highly suspect yet it was the most significant evidence linking Reyes to the Rockford Park Murders.**

There was very limited evidence presented at the Reyes Rockford Park Trial that linked Reyes to the Rockford Park Murders. Indeed, there was no physical evidence at all that connected Reyes to the Rockford Park Murders. Instead, most of the evidence presented linked the murders to Cabrera who had already been tried and convicted. Instead, the only evidence presented at Reyes Rockford Park Trial that linked Reyes to the Rockford Park Murders was the testimony of Roderick Sterling, a convicted sex offender who received a significant advantage by testifying against Reyes and who did not even have personal knowledge about the claims he made against Reyes. The Trial Court described this as "the most significant testimony" presented against Reyes by the State.[50]

**1. The benefit offered to Sterling by the State in exchange for Sterling's testimony rendered Sterling's testimony unreliable.**

Sterling was arrested on May 2, 1997, for raping a seven-year-old child. Sterling was charged with two counts of Unlawful Sexual Intercourse First Degree and detained at Howard R. Young Correctional Institution ("HRYCI"). At that time, Reyes was also detained at HRYCI for the Otero murder and no one had yet been charged with the 1996 Rockford Park Murders.[51]

---

[50] *Reyes Sentencing*, 2002 WL 484641, at *8.

[51] Reyes was sentenced for the Otero murder on September 25, 1998. Upon sentencing, Reyes would have been moved to the sentenced population at HRYCI.

18

In June 1997, Sterling—with the assistance of his cellmate Ivan Galindez—sent a letter to Sterling's attorney in the child rape case claiming to have information in connection with the Rockford Park Murders. Specifically, Sterling claimed he had overheard Reyes admit Reyes was responsible for the Rockford Park Murders when Reyes was speaking to Galindez. On January 20, 1998, Sterling gave a statement to the police claiming that sometime between May 1997 and June 23, 1997, a conversation took place between Galindez and Reyes regarding the Rockford Park Murders, which Sterling claimed to have overheard.

On December 1, 1998, Sterling pled guilty to one count of Unlawful Sexual Intercourse Second Degree and was sentenced by Order dated January 29, 1999, to twenty (20) years at Level V, suspended after ten (10) years at Level V, followed by ten (10) years of community-based supervision. On December 6, 1999, Cabrera and Reyes were indicted for the Rockford Park Murders. On September 14, 2001, four days before jury selection for the Reyes Rockford Park Trial, Sterling agreed to testify at the Reyes Rockford Park Trial about the alleged jailhouse confession by Reyes.

Sterling received a huge benefit for his testimony against Reyes. Indeed, after Sterling's testimony in the Reyes Rockford Park Trial, the State joined Sterling's motion to withdraw his guilty plea to Unlawful Sexual Intercourse Second Degree. The motion was granted; Sterling withdrew his plea; the State

19

offered Sterling a plea to the lesser offense of Unlawful Sexual Intercourse Third Degree, and recommended a sentence of ten (10) years at Level V, suspended *immediately* for time served for non-reporting probation at Level I, with the expectation that Sterling would promptly be deported to Jamaica. Therefore, in exchange for his testimony against Reyes, Sterling was released immediately from prison for time served on February 4, 2002, serving half the time to which he was originally sentenced.

### 2. Sterling did not have personal knowledge regarding the claims he made and, therefore, Reyes was deprived of his Sixth Amendment Right of Confrontation.

Sterling testified inaccurately at the Reyes Rockford Park Trial that Sterling overheard a conversation at HRYCI between Reyes and Galindez and that, in that conversation, Reyes admitted to Galindez that Reyes killed Saunders and Rowe. In other words, when Sterling testified, he claimed to have personal knowledge regarding Reyes' alleged statements. However, in September 2008 when private investigators interviewed Sterling in Jamaica, Sterling claimed that he learned details of the Rockford Park Murders from Galindez and not from Reyes.[52] Reyes had a Sixth Amendment right to confront the witness who testified against him.[53]

---

[52] *State v. Reyes*, 2012 WL 8256131, at *9 (Del. Super. Nov. 13, 2012).
[53] *Franco v. State*, 918 A.2d 1158, 1161 (Del. 2007) ("Both the United States and the Delaware Constitutions guarantee an accused the right to confront the witnesses against him in all criminal prosecutions.").

20

Because Sterling testified against Reyes and not Galindez, Reyes' Sixth Amendment right was violated.

**3. The State violated *Brady* by failing to disclose impeachment evidence.**

The State violated Reyes' constitutional rights by failing to disclose impeachment evidence concerning Sterling. Specifically, the State knew that Sterling had a history of drug and alcohol use, convictions, and treatment, yet failed to provide this information to Reyes Trial Counsel. Reyes was prejudiced because without access to this impeachment evidence, Sterling could not properly be cross-examined with information that called into question Sterling's reliability.

Under *Brady*, the State may not suppress evidence that is favorable to a defendant if the evidence is material to either guilt or punishment.[54] Under Delaware law, there are three necessary elements for a finding that a *Brady* violation occurred: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice ensued.[55] Impeachment evidence falls within *Brady* because it is "'evidence favorable to an accused,' so that, if disclosed and used effectively, it

---

[54] *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Atkinson v. State*, 778 A.2d 1058, 1062 (Del. 2001) (applying *Brady*).
[55] *Starling*, 2015 WL 8758197, at *12.

21

may make the difference between conviction and acquittal."[56]  Moreover, "[e]ffective cross-examination is essential to a defendant's right to a fair trial" because it is the "'principal means by which the believability of a witness and the truth of [his] testimony are tested.'"[57]  To reverse a conviction based on a *Brady* violation, a defendant must show that the undisclosed evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."[58]  The suppressed evidence must "create[] a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."[59]

Most recently, the Delaware Supreme Court addressed *Brady* violations in *Starling v. State*.[60]  The Court held that the State violated *Brady* when it "inaccurately describe[ed] the status of [] criminal charges" of a pivotal witness.[61]  Indeed, the witness identified Starling as the shooter involved in the deaths of two individuals.[62]  The Delaware Supreme Court identified the witness as "the State's main witness" whose credibility was at stake.[63]  Specifically, the State inaccurately represented to Starling's trial counsel that the witness' violation of probation and

---

[56] *Atkinson*, 778 A.2d at 1062 (internal citations omitted).
[57] *Id*. at 1061-62 (internal citations omitted).
[58] *Jackson v. State*, 770 A.2d 506, 516 (Del. 2001).
[59] *Starling*, 2015 WL 8758197, at *12.
[60] *See id.* at *1.
[61] *Id.* at *10.
[62] *Id.* at *1.
[63] Id. at *14, 15.

outstanding capias were pending during trial; however, those pending legal matters had in fact been dismissed before Starling's trial.[64]

The reasoning of the Delaware Supreme Court in *Starling* is applicable here. Just as there was no physical evidence linking Reyes to the Rockford Park Murders, there was also "no physical evidence linking Starling to the crime" of which he was convicted.[65] Like the identification witness about whom the Supreme Court expressed concerns, Roderick Sterling was the State's "main witness" in the Reyes Rockford Park Trial. In *Starling*, the State inaccurately described the pending criminal charges against the State's pivotal witness; similarly, in the Reyes Rockford Park Trial, the State failed to disclose Roderick Sterling's history of drug and alcohol abuse, convictions, and treatment. Reyes could have utilized this information to cast doubt on the credibility of Roderick Sterling as a witness. Cross-examination is critical to a fair trial.[66]

## D. There was a miscarriage of justice in the Reyes Rockford Park Trial.

Viewing the Reyes Rockford Park Trial conviction and sentencing as a whole, Reyes' right to a fair trial was seriously undermined. There are colorable claims of miscarriage of justice in the Reyes Rockford Park Trial, and Reyes was

---

[64] *Id.* at *10-11.
[65] *Id.* at *1
[66] *Atkinson*, 778 A.2d at 1062.

deprived of his constitutional trial rights. Accordingly, because the integrity of the Reyes Rockford Park Trial was compromised, the conviction must be vacated.

## IV. REYES' ROCKFORD PARK SENTENCING DID NOT MEET CONSTITUTIONAL STANDARDS BECAUSE THERE WAS INADEQUATE CONSIDERATION OF REYES' STATUS AS AN ADOLESCENT AND HIS IMMATURE BRAIN DEVELOPMENT.

When Fundador Otero was murdered, Reyes was just seventeen (17) years old. At the time, Reyes was a high school student and varsity member of the A.I. DuPont High School wrestling team. Reyes confessed to his role in Otero's murder, and agreed to testify against Cabrera.[67] At Cabrera's Otero murder trial, Reyes admitted his role, but also explained his reluctance to participate in the crime. Reyes explained how he succumbed to pressure placed on him by Cabrera. In the Reyes Rockford Park Trial—although Reyes was only seventeen (17) years old at the time and despite his confession and cooperation with the police during the Otero investigation and trial—the State and the Trial Court emphasized Reyes' role in the Otero murder as the most significant non-statutory aggravating factor supporting the death penalty for the Rockford Park Murders.

At the time of the Otero murder, Reyes was seventeen (17) years old. At the time of the Rockford Park Murders, Reyes was eighteen (18) years old.[68]

---

[67] In marked contrast to his admissions during the Otero murder investigation, Reyes steadfastly professed his innocence with respect to the Rockford Park Murders.

[68] At the time of the Rockford Park Murders, Reyes was one month shy of his 19th birthday. While the State emphasized that the murder victims were teenagers, the State did not

Although Reyes had reached the chronological age of adulthood, Reyes was a youthful offender at the time of the Rockford Park Murders. The weight attributed to the Otero crime, for purposes of the penalty phase for the Rockford Park Murders, is inconsistent with the constitutional standards established by the United States Supreme Court for youthful offenders, especially in consideration of the relationship between Cabrera and Reyes. The constitutional standards for sentencing of a youthful offender demand full consideration of Reyes' youth and brain development, as well as consideration of Cabrera's negative influence, particularly in a death penalty case.

### A. Constitutional jurisprudence pre-2001

In 1982, the United States Supreme Court decided *Eddings v. Oklahoma*,[69] and held:

> [Y]outh is more than a chronological fact. It is a time and condition of life when a person may be *most susceptible to influence* and to psychological damage. Our history is replete with laws and judicial recognition that minors, especially in their earlier years, generally are less mature and responsible than adults.[70]

The *Eddings* Court noted: "'[D]uring the formative years of childhood and adolescence, minors often lack the experience, perspective, and judgment'

---

acknowledge that Reyes was also only a teenager at the time. Indeed, Reyes was a *classmate* of the victims.

[69] 455 U.S. 104 (1982).

[70] *Id.* at 115–116 (emphasis added).

expected of adults."[71]  The conclusions reached in *Eddings* relied, in part, on task force reports dating back to 1967, which provided:

> Adolescents everywhere, from every walk of life, are often dangerous to themselves and to others.  [A]dolescents, particularly in the early and middle teen years, are more vulnerable, more impulsive, and less self-disciplined than adults. Crimes committed by youths may be just as harmful to victims as those committed by older persons, but they deserve less punishment because adolescents may have less capacity to control their conduct and to think in long-range terms than adults. Moreover, youth crime as such is not exclusively the offender's fault; offenses by the young also represent a failure of family, school, and the social system, which share responsibility for the development of America's youth.[72]

The *Eddings* Court explained that consideration of an adolescent defendant's background, as well as the defendant's mental and emotional development, did not serve to excuse the defendant's legal responsibility for the crime committed.[73] Rather, such considerations are important because "just as the chronological age of a minor is itself a relevant mitigating factor of great weight, so must the background *and mental and emotional development of a youthful defendant* be duly considered in sentencing [for the crime of murder]."[74]

In 1988, the United States Supreme Court held in *Thompson v. Oklahoma*[75] that "the execution of a person who was under 16 years of age at the time of his or

---

[71] *Id.* at 116 (quoting *Bellotti v. Baird*, 443 U.S. 622, 635 (1979)).
[72] *Id.* at 115, n.11.
[73] *Id.* at 116 (acknowledging that youths were committing increasingly violent crimes).
[74] *Id.* at 116 (emphasis added).
[75] 487 U.S. 815 (1988).

her offense" is unconstitutional.[76]  The *Thompson* Court's reasoning, rather than its holding, is of interest to this Court.   Specifically, the decision in *Thompson* explained that distinctions between juveniles and adults abound in society and these distinctions should apply for purposes of sentencing young criminal defendants:

> Justice Powell has repeatedly reminded us of the importance of "the experience of mankind, as well as the long history of our law, recognizing that there *are* differences which must be accommodated in determining the rights and duties of children as compared with those of adults. Examples of this distinction abound in our law: in contracts, in torts, in criminal law and procedure, in criminal sanctions and rehabilitation, and in the right to vote and to hold office."[77]

> \* \* \* \*

> It is generally agreed "that punishment should be directly related to the personal culpability of the criminal defendant."  There is also broad agreement on the proposition that adolescents as a class are less mature and responsible than adults. We [have] stressed this difference in explaining the importance of treating the defendant's youth as a mitigating factor in capital cases . . . . Thus, the Court has already endorsed the proposition that less culpability should attach to a crime committed by a juvenile than to a comparable crime committed by an adult.  The basis for this conclusion is too obvious to require extended explanation.  Inexperience, less education, and less intelligence make the teenager less able to evaluate the consequences of his or her conduct while at the same time he or she is much more apt to be motivated by mere emotion or peer pressure than is an adult. The reasons why juveniles are not trusted with the privileges and responsibilities of an adult also explain why their irresponsible conduct is not as morally reprehensible as that of an adult.[78]

---

[76] *Id.* at 838.
[77] *Id.* at 823 (internal citations omitted).
[78] *Id.* at 834–35 (internal citations omitted).

In 1993, the United States Supreme Court revisited the issue of youth as a mitigating factor in *Johnson v. Texas*.[79] The *Johnson* Court made clear that "[t]here is no dispute that a defendant's youth is a relevant mitigating circumstance that must be within the effective reach of a capital sentencing jury if a death sentence is to meet the requirements of *Lockett* and *Eddings*."[80] The *Johnson* Court held:

> A lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions. A sentencer in a capital case *must be allowed to consider the mitigating qualities of youth* in the course of its deliberations over the appropriate sentence.[81]

The *Johnson* Court stressed the importance of presenting the qualities of youth as mitigating evidence:

> Even on a cold record, one cannot be unmoved by the testimony of petitioner's father urging that his son's actions were due in large part to his youth. It strains credulity to suppose that the jury would have viewed the evidence of petitioner's youth as outside its effective reach in answering the second special issue. *The relevance of youth as a mitigating factor derives from the fact that the signature qualities of*

---

[79] 509 U.S. 350 (1993).

[80] *Id.* at 367 (citing *Sumner v. Shuman,* 483 U.S. 66, 81–82 (1987); *Eddings,* 455 U.S. at 115; *Lockett v. Ohio*, 438 U.S. 586, 608 (1978) (plurality opinion)); *see Lockett*, 438 U.S. at 604 ("[W]e conclude that the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.") (emphasis added).

[81] *Johnson*, 509 U.S. at 367 (emphasis added).

*youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside.*[82]

Therefore, the constitutional precedent at the time of the Reyes Rockford Park Trial—as established in 1982, 1988, and 1993—required Reyes Trial Counsel to present the transient qualities of youth as mitigating evidence. The purpose of such a presentation was to advise a jury that the youthfulness of a criminal defendant is to be viewed as more than a chronological age. Rather, youthful criminal defendants, such as Reyes, are *adolescents*, susceptible to their environment, negative influences, and peer pressures but often without the fully developed brain and ability to appreciate the consequences for their reckless and dangerous behaviors. More importantly, evidence of youthfulness allows a jury to consider the fact that, as the youthful defendant ages, his emotional and mental intelligence will develop along with the wherewithal to reason, rationalize, and comprehend consequence.

## B. *Roper v. Simons*

In 2005, the United States Supreme Court readdressed the presentation in a capital trial of youthfulness as mitigating evidence in *Roper v. Simmons*.[83] The *Roper* Court recognized that capital punishment, the ultimate punishment, should be limited to a narrow category of defendants who commit the most heinous crimes

---

[82] *Id.* at 368 (emphasis added).
[83] 543 U.S. 551 (2005).

with extreme culpability. The Court held that a defendant under the age eighteen (18)—a juvenile—could not receive the death penalty even when the juvenile defendant commits a heinous crime.[84]

In reaching its conclusion, the *Roper* Court noted three general differences between juveniles and adults that render the death penalty unconstitutional for juveniles. First, according to scientific and sociological data, juveniles lack maturity and have an underdeveloped sense of responsibility.[85] Second, "juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure."[86] "This is explained in part by the prevailing circumstance that juveniles have less control, or less experience with control, over their own environment."[87] Third, juveniles have not developed a sense of character as their personality traits are "more transitory, less fixed."[88]

The *Roper* Court summarized the significance of a juvenile's transient youth as follows:

---

[84] *Id.* at 568, 570–71 (holding that juveniles are of a diminished capacity and, thus, the Eighth Amendment prohibits the imposition of the death penalty on juvenile offenders under eighteen years of age.)

[85] *Id.* at 569 (relying, in part, on data from a 1992 study: Arnett, Reckless Behavior in Adolescence: A Developmental Perspective, 12 DEVELOPMENTAL REV. 339 (1992)).

[86] *Id.*

[87] *Id.* (relying, in part, on data from a 2003 report: Steinberg & Scott, Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty, 58 AM. PSYCHOLOGIST 1009, 1014 (2003), providing, "[A]s legal minors, [juveniles] lack the freedom that adults have to extricate themselves from a criminogenic setting.").

[88] *Id.* at 570 (relying, in part, on data from a 1968 report: E. Erikson, Identity: Youth and Crisis (1968)).

The susceptibility of juveniles to immature and irresponsible behavior means "their irresponsible conduct is not as morally reprehensible as that of an adult." Their own vulnerability and comparative lack of control over their immediate surroundings mean juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment. The reality that juveniles still struggle to define their identity means it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character. *From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed.*[89]

The *Roper* decision was issued three years after the imposition of Reyes' death sentence. Despite the timing of *Roper* after the Reyes Rockford Park Trial, the decision is significant. First, the *Roper* decision is rooted in United States Supreme Court precedent and data from scientific and sociological studies that *pre-date* the Reyes Rockford Park Trial. Indeed, brain development—particularly development of the brain's executive functions—was already a topic of discussion and scientific research at the time of the Reyes Rockford Park Trial.[90] Accordingly, while the *Roper* decision did establish a new constitutionally-based rule of law three years after the Reyes Rockford Park Trial, *Roper* did so, almost

---

[89] *Id.* (internal citations omitted) (emphasis added).
[90] *See e.g.*, Anderson, Vicki A., et. al, *Development of Executive Functions Through Late Childhood and Adolescence in an Australian Sample*, DEVELOPMENTAL NEUROPSYCHOLOGY, Vol. 20, Issue 1, p. 385–406 (2001); Nagera, Humberto, M.D., *Reflections on Psychoanalysis and Neuroscience: Normality and Pathology in Development, Brain Stimulation, Programming, and Maturation*, NEUROPSYCHOANALYSIS: AN INTERDISCIPLINARY JOURNAL FOR PSYCHOANALYSIS AND THE NEURSCIENCES, Vol. 3, Issue 2, p. 179–191 (2001); Welsh, Marilyn C., et. al., *A normative-developmental study of executive unction: A window on prefrontal function in children*, DEVELOPMENTAL NEUROPSYCHOLOGY, Vol. 7, Issue 2, p. 131–149 (1991).

entirely, based on information readily available to Reyes Trial Counsel in 2001. Second, this Court acknowledges that Reyes was eighteen (18) years old at the time of the Rockford Park Murders and, therefore, the rule of *Roper* does not strictly apply; nevertheless, as the *Roper* Court explained: "the qualities that distinguish juveniles from adults *do not disappear when an individual turns 18*."[91]

Reyes Trial Counsel should have explored and presented mitigating evidence concerning the qualities of Reyes' youth. Moreover, in its penalty phase presentation, the State emphasized Reyes' involvement in the Otero murder, which occurred when Reyes was only a seventeen (17) year old juvenile. More importantly, the Trial Court relied heavily on the Otero murder in sentencing Reyes to death, explaining that the "non-statutory aggravating circumstance [of Reyes' involvement in the Otero murder] weighs about as heavily as such circumstance can get."[92]

### C. Evolving Standards Evidenced in *Graham v. Florida* and *Miller v. Alabama*

The trend of recognizing the constitutional differences between youth and adulthood continued in the United States Supreme Court's 2010 decision in *Graham v. Florida*.[93] Noting that juvenile offenders are less culpable than adults, the *Graham* Court held that it was unconstitutional to sentence a juvenile to life

---

[91] *Roper*, 543 U.S. at 574 (emphasis added).
[92] *Reyes Sentencing*, 2002 WL 484641, at *512.
[93] 560 U.S. 48 (2010).

imprisonment for any crimes less serious than murder. Referencing *Roper*, the *Graham* Court explained that "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds. For example, parts of the brain involved in behavior control continue to mature through late adolescence."[94] The underlying message of *Graham* is consistent with the message of its decisional predecessors: "[j]uveniles are more capable of change than are adults, and their actions are less likely to be evidence of 'irretrievably depraved character' than are the actions of adults."[95]

In 2012, the United States Supreme Court decided *Miller v. Alabama*.[96] Reiterating the notion that juveniles are "less deserving of the most severe punishments,"[97] and relying on the aforementioned constitutional precedent, the *Miller* Court held it was unconstitutional to "require[] that all children convicted of homicide receive lifetime incarceration without possibility of parole, *regardless of their age and age-related characteristics and the nature of their crimes.*"[98]

The reasoning and analysis in support of the rule of *Miller*, rather than the rule itself, is relevant to the matter pending before this Court. The *Miller* Court

---

[94] *Id.* at 68.

[95] *Id.* (quoting *Roper*, 543 U.S. at 570).

[96] 132 S.Ct. 2455 (2012).

[97] *Id.* at 2464.

[98] *Id.* at 2475 (emphasis added). Further, on January 25, 2016, the Supreme Court of the United States decided *Montgomery v. Louisiana* and held that *Miller's* ban on mandatory life-without parole sentences for juvenile offenders must be applied retroactively. *See Montgomery v. Louisiana*, 577 U.S. __ (2016). As noted, *infra* ns.102-04, the Delaware legislature has already extended *Miller* retroactively by statute.

concluded that such a mandate—that all juveniles convicted of homicide receive life without a chance of parole—precludes the sentencer from considering critical factors related to the youthful offender even when imposing the harshest penalties. According to the *Miller* Court, such a mandate precluded consideration of factors such as: (1) the hallmark features of chronological age (immaturity, impetuosity, and the failure to appreciate consequence); (2) the family and home environment from which the youthful offender could not extricate himself; (3) the circumstances surrounding the homicide offense (including the offenders involvement and the effects of peer pressure); (4) the vulnerabilities to negative influence; (5) the features that distinguish adolescents from adulthood; and (6) the possibility of rehabilitation.[99]   The concept explained in *Miller* was not new, it was just simplified: children are different.[100]

In response to *Graham* and *Miller*, in 2013, the Delaware General Assembly amended Chapter 42 of Title 11 of the Delaware Code by inserting Section 4209A[101] and amending Section 4204A[102] to conform Delaware law to the

---

[99] *Miller*, 132 S.Ct. at 2468.
[100] *Id.* at 2464.
[101] 11 *Del. C.* § 4209A, entitled Punishment for first-degree murder committed by juvenile offenders, provides:

> Any person who is convicted of first-degree murder for an offense that was committed before the person had reached the person's eighteenth birthday shall be sentenced to term of incarceration not less than 25 years to be served at Level V up to a term of imprisonment for the remainder of the person's natural life to be served at Level V without benefit of probation or parole or any other reduction.

constitutional requirements stated by the United States Supreme Court, specifically the differences between juveniles and adult offenders for purposes of sentencing.[103]

### D. Reyes Trial Counsel's mitigation presentation did not include adequate information regarding Reyes' youth as a mitigating factor and, therefore, did not meet constitutional standards.

Reyes Trial Counsel did not present the transient qualities of Reyes' youth in accordance with constitutional demands. To the contrary, Reyes Trial Counsel emphasized Reyes' status as an irredeemable adult predisposed to violence, which Reyes was unable to avoid as an adult. Instead of presenting Reyes as a youthful offender who should be considered less culpable, Reyes Trial Counsel actually presented a so-called "mitigation" case that emphasized Reyes as a violent and dangerous person.

In their penalty phase opening statement, Reyes Trial Counsel showed a picture of Reyes as a toddler—"Point A"—and pointing to Reyes, a convicted murder, in the courtroom—"Point B"—Reyes Trial Counsel explained to the jury that its penalty phase presentation would present evidence meant to "take [the jury] from point A to B. We will introduce this evidence to you for one purpose so you

---

[102] 11 *Del. C.* § 4204A (providing for the confinement of youth convicted in Superior Court).
[103] *See* Del. Bill Summ., 2013 Reg. Session. S.B. 9 (147th General Assembly 2013) (May 16, 2013).

can understand why Luis Reyes turned out the way he is."[104]  Reyes Trial Counsel

explained its point A to B theory to the jury as follows:

> [T]he evidence is important to help you understand how a child at
> risk, [a] child like Luis Reyes is molded into a teenager who makes
> horrible wrong choices.  You will hear from our witnesses that at
> certain important stages of his development Luis Reyes was exposed
> to certain behaviors by his family members that put him at high risk to
> commit violent acts . . . .  You will hear Mr. Reyes lived in as home
> with domestic violence both physical and verbal.[105]

Additionally, in its closing statements of the penalty phase, Reyes Trial

Counsel stated, "[t]here is only one truly important question in this case and that's

how and why Luis Reyes developed the capacity to commit murder."[106]  Then

Reyes Trial Counsel asked the jury, rhetorically, "How does a child, born like any

other child, develop into *a teenage murderer*?"[107]  Finally, in one of the final

comments for the jury's consideration, Reyes Trial Counsel told the jury: "Reyes'

life was marked, measured, and set into place when he was still a child.  [Reyes]

was unable to escape from the tragic path of his life, though others have escaped,

and he became a criminal like all the men who grew up in the Reyes household."[108]

The record demonstrates that Reyes Trial Counsel only discussed Reyes'

"youth" to support a theme that Reyes had been "hardwired for violence" and

became a violent and dangerous adult.  Reyes was presented as someone who was

---

[104] Penalty Phase Tr. Oct. 23, 2001 at 27:5–12.
[105] *Id.* at 28:15–21, 29:11–12.
[106] Penalty Phase Tr. Oct. 25, 2001 at 113:2–4.
[107] *Id.* at 121:1–2 (emphasis added).
[108] *Id.* at 137:18–23.

fully developed and beyond the capacity for change. Reyes Trial Counsel did not offer even the possibility for change as Reyes matured chronologically, mentally, intelligently, and so on. Indeed, the jury never heard the idea that the capacities of a youthful offender are less than that of an adult and that youths are still developing and maturing even though these concepts are at the very heart of the jurisprudence demanding consideration of the qualities of youth as mitigating evidence.

This Court is not suggesting that it is *per se* unreasonable for defense counsel to present only "negative" aspects as its mitigation strategy. It seems that the strategy of Reyes Trial Counsel was meant to avoid death for their client. Nevertheless, in light of constitutional demands, prevailing professional norms, the mitigation investigation conducted, and all of the relevant mitigating evidence in the record, including the postconviction record, the Court finds the presentation did not meet constitutional standards. This is especially because of the Trial Court's significant reliance on Reyes' involvement at age seventeen (17) in the Otero murder as well as Reyes' age at the time of the Rockford Park Murders.

Reyes Trial Counsel failed to present the age-related characteristics of Reyes that weighed against Reyes' moral culpability for the Rockford Park Murders. Instead, Reyes Trial Counsel solely presented "negative" aspects of Reyes and his childhood and argued, essentially, that Reyes was born and raised to become the

violent man sitting before the jury. Such a mitigation strategy is entirely inconsistent with the well-known concepts of youth underlying our constitutional jurisprudence.[109] Executing Reyes based on this presentation would violate constitutional standards. For these reasons, Reyes' death sentence must be vacated.

## V. <u>INEFFECTIVE ASSISTANCE OF COUNSEL</u>

### A. Standard for Ineffective Assistance of Counsel

Reyes claims that Reyes Trial Counsel provided ineffective legal assistance in violation of Reyes' rights under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution and Article 1, Section 7 of the Delaware Constitution. The standard used to evaluate claims of ineffective counsel is the two-prong test articulated by the United States Supreme Court in *Strickland v. Washington*,[110] as adopted in Delaware.[111] The movant must show that (1) trial counsel's representation fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for trial counsel's unprofessional errors, the result of the proceeding would have been different.[112] Failure to prove either prong will render the claim insufficient.[113] Moreover, the Court shall dismiss entirely

---

[109] With respect to the evidence that Reyes Trial Counsel failed to produce in mitigation regarding Reyes' developmental issues, *see infra* Section V(C) generally.
[110] 466 U.S. 668 (1984).
[111] *See Albury v. State*, 551 A.2d 53 (Del. 1988).
[112] *Strickland*, 466 U.S. at 687.
[113] *Id.* at 688; *Dawson v. State*, 673 A.2d 1186, 1196 (Del. 1996).

conclusory allegations of ineffective counsel.[114] The movant must provide concrete allegations of prejudice, including specifying the nature of the prejudice and the adverse affects actually suffered.[115]

With respect to the first prong—the performance prong—the movant must overcome the strong presumption that counsel's conduct was professionally reasonable.[116] To satisfy the performance prong, Reyes must assert specific allegations to establish Reyes Trial Counsel acted unreasonably as viewed against "prevailing professional norms."[117] With respect to the second prong—the prejudice prong—cumulative error can satisfy the prejudice prong when it undermines confidence in the verdict.[118]

## B. Reyes has established Ineffective Assistance of Counsel in the guilt phase of the Reyes Rockford Park Trial.

With no physical evidence linking Reyes to the Rockford Park Murders, it was essential for a fair trial that Reyes Trial Counsel "use all available impeachment evidence, and make timely and appropriate objections to the admission of evidence going to the heart of the State's case."[119] Roderick Sterling's testimony was at the heart of the State's case against Reyes. This Court finds that the errors by Reyes

---

[114] *Younger*, 580 A.2d at 555; *Jordan v. State*, 1994 WL 466142, at *1 (Del. Aug. 25, 1994).
[115] *Strickland*, 466 U.S. at 692; *Dawson*, 673 A.2d at 1196.
[116] *Strickland*, 466 U.S. at 687–88.
[117] *Id.* at 688; *Wright v. State*, 671 A.2d 1353, 1356 (Del. 1996) ("Mere allegations of ineffectiveness will not suffice.").
[118] *See Starling*, 2015 WL 8758197, at *14-15.
[119] *Id.* at *1.

Trial Counsel during the guilt phase of the Reyes Rockford Park Trial resulted in cumulative prejudice to Reyes.

**1. Reyes Trial Counsel failed to establish that the information Sterling provided in the letter to Sterling's counsel was hearsay.**

Under the DRE, hearsay is inadmissible unless otherwise provided by the DRE or law.[120] It is well-established under the DRE that admissions by party opponents are considered non-hearsay.[121] Admissions by a party include statements made by the party himself and "statements which he has manifested his adoption or belief in its truth."[122]

Sterling sent a letter to his counsel ("Sterling Letter") claiming that Reyes admitted his role in the Rockford Park Murders and Sterling testified about the Sterling Letter at the Reyes Rockford Park Trial. Sterling admitted at the Reyes Rockford Park Trial that Galindez wrote the Sterling Letter and that Sterling signed it.[123] At the Reyes Rockford Park Trial, Reyes Trial Counsel objected to Sterling's testimony regarding the Sterling Letter on hearsay grounds.[124] Overruling Reyes Trial Counsel's objection, the Trial Court found that even though Galindez and not Sterling wrote the Sterling Letter, Sterling adopted the

---

[120] D.R.E. 802.

[121] D.R.E. 801(d)(2); *Flonnory v. State*, 893 A.2d 507, 516 (Del. 2006).

[122] D.R.E. 801 (d)(2)(A)-(B).

[123] Guilt Phase Tr. Oct. 3, 2001 at 36:3-4; 39:12-16.

[124] *Id.* at 36:11-23; 37:1-23.

contents of the Sterling Letter and, therefore, testimony regarding the Sterling Letter was admissible under the DRE.[125]

Although Reyes Trial Counsel properly objected to Sterling's testimony about the Sterling Letter, Reyes Trial Counsel did not present an accurate and thorough basis for the hearsay objection to the Trial Court. Specifically, even if the Trial Court agreed with the State that Sterling adopted the statements by Galindez by signing the Sterling Letter, the letter was hearsay. Particularly, Sterling testified at the Reyes Rockford Park Trial that the information within the Sterling Letter was learned by Sterling when Sterling overheard a conversation between Reyes and Galindez.[126] However, in September 2008 when private investigators interviewed Sterling in Jamaica, Sterling stated that he learned details of the Rockford Park Murders from Galindez directly and not by overhearing a conversation between Galindez and Reyes.[127] In other words, even though Sterling claimed at the Reyes Rockford Park Trial that he had personal knowledge of the contents of the Sterling Letter, Sterling did not have personal knowledge. Accordingly, the Sterling Letter was hearsay, but this argument was not presented for the Trial Court's consideration. This failure reflected inadequate trial preparation which was not reasonable performance under the circumstances

---

[125] *Id.* at 37:1-12.
[126] Guilt Phase Tr. Oct. 3, 2001 at 8:15-23; 9:1-21.
[127] *Reyes*, 2012 WL 8256131, at *9.

41

especially, where, as here, Sterling was the *only* witness to link Reyes to the Rockford Park Murders.

Moreover, Sterling may have signified adoption of Galindez's writing, but adoptive admissions are only considered non-hearsay as to parties. Neither Galindez nor Sterling was a party in the Reyes Rockford Park Trial. Therefore, Reyes Trial Counsel should have presented argument that the Sterling Letter was hearsay if it was to be offered for the truth of its contents. Reyes Trial Counsel's failure to make this argument was unreasonable and Reyes has established the performance prong of *Strickland*.

## 2. Reyes Trial Counsel's failure to call Galindez as a witness was objectively unreasonable.

Reyes Trial Counsel was ineffective by failing to call Galindez as a witness. Only Galindez could have challenged Sterling's testimony, which was "the most significant testimony" against Reyes.[128]

Sterling claimed that Sterling overheard and understood conversations between Reyes and Galindez. However, if Galindez had testified, Galindez would have demonstrated that Sterling's claim was false because Sterling could not possibly have understood any conversation between Galindez and Reyes. At trial, Sterling testified that he did not speak Spanish and only understood Spanish "a

---

[128] *Reyes Sentencing*, 2002 WL 484641, at *8.

little bit."[129]   Sterling further testified that he heard the conversation between Galindez and Reyes in English.[130]   However, in a 2012 affidavit, Galindez provided:

> [] While I was serving my sentence [at Gander Hill], I was on the same pod as Luis Reyes.  [] Luis Reyes and I talked about a lot of things while we were on the same pod.  [] When I spoke to Luis Reyes, I spoke to him in Spanish because at the time, I spoke very little English.  [] At the time, my cell[mate] was Roderick Sterling.  [] Roderick Sterling did not speak Spanish.[131]

Reyes Trial Counsel fell below an objective standard of reasonableness when they failed to call Galindez as a witness.  It was critical to challenge Sterling's claim that Sterling heard Reyes tell Galindez that Reyes participated in the Rockford Park Murders.  Accordingly, Reyes has established the performance prong of *Strickland*.

### 3. Reyes Trial Counsel failed to request a missing evidence instruction.

The State never produced the Sterling Letter.  Importantly, Reyes Trial Counsel did not request a missing evidence instruction for the Sterling Letter.  Had Reyes Trial Counsel requested the instruction, the jury would have received the standard *DeBerry* instruction, providing that the jury is to assume the missing evidence is exculpatory for Reyes:

---

[129] Guilt Phase Tr. Oct. 3, 2001 at 72:11-16.
[130] *Id.* at 75:3-9.
[131] Aff. of Ivan Galindez, Nov. 28, 2012.

In this case, the Court has determined that the State failed to create or to preserve certain evidence, which is material to the defense. The failure of the State to create or preserve such evidence entitles the Defendant to an inference that, if such evidence were available at trial, it would be exculpatory. This means that, for purposes of deciding this case, you are to assume that the missing evidence, had it been created or preserved, would not have incriminated the Defendant, but would have been favorable to his assertion of not guilty.[132]

Reyes Trial Counsel's performance fell below an objective standard of reasonableness and Reyes has established the performance prong of *Strickland*.

### 4. Reyes Trial Counsel failed to notify the Court that presenting Cabrera as a witness was critical to Reyes' defense.

Approximately one week before the Reyes Rockford Park Trial, Reyes Trial Counsel received a letter from Cabrera who wanted to help Reyes, but not at the expense of admitting his own guilt.[133] Cabrera's counsel subsequently advised Reyes Trial Counsel that Cabrera would not be testifying on behalf of Reyes and if Cabrera was called, he would invoke his Fifth Amendment privilege.[134]

Cabrera was a critical witness for Reyes' defense. Had Cabrera been available as a witness, Cabrera would have testified that Reyes was not responsible for the Rockford Park Murders. Furthermore, Cabrera would have testified that a man named Neil Walker had committed the murders. Additionally, Cabrera would

---

[132] *See, e.g., State v. Adgate*, 2014 WL 3317968, at *5 (Del. Super. July 7, 2014); *see also DeBerry v. State*, 457 A.2d 744 (Del. 1983).
[133] Letter from Luis Cabrera to Reyes Trial Counsel, Sept. 23, 2001.
[134] Letter from John P. Deckers to Reyes Trial Counsel, Oct. 9, 2001.

have offered details about an altercation that involved Walker, Cabrera, Saunders, and Rowe that gave a motive for Walker to commit the Rockford Park Murders.[135]

Under DRE 803(b)(3), statements against interest are those statements that "at the time of its making, so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true." Statements against interest are admissible when a declarant is unavailable to testify, which includes when a declarant has invoked his Fifth Amendment privilege against self-incrimination.[136] Moreover, "[a] statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."[137]

---

[135] Cabrera provided these details to Reyes Trial Counsel during an interview in March 2001. Reyes Trial Counsel also reviewed—prior to meeting with Cabrera—a report from an investigator who interviewed Cabrera for the Otero case in August 1997. The investigator's report provided similar details, as recounted by Cabrera, regarding the altercation with Saunders, Rowe, and Walker. Importantly, Cabrera maintained the same account even after Reyes testified against Cabrera in the Otero case.

[136] D.R.E. 804(a)(1); *see also Demby v. State*, 695 A.2d 1152, 1158 (Del. 1997) (noting that a witness was "unavailable" because he invoked his Fifth Amendment privilege).

[137] D.R.E. 804(b)(3). In determining whether there are sufficient corroborating circumstances to indicate trustworthiness of an unavailable declarant's statements, the Court considers: (1) whether the statements were made spontaneously and in close temporal proximity to the commission of the crime at issue; (2) the extent to which the statements were truly self-incriminatory and against penal interest; (3) consideration of the reliability of the witness who was reporting the hearsay statement; and (4) the extent to which the statements were corroborated by other evidence in the case. *Demby v. State*, 695 A.2d 1152, 1158 (Del. 1997).

Cabrera's proposed statements about Reyes' factual innocence met the standard under DRE 803(b)(4) because the statements exposed Cabrera to criminal liability and were contrary to Cabrera's penal interests.[138]  Nevertheless, the Trial Court did not rule on the admissibility of Cabrera's statements during the Reyes Rockford Park Trial because Reyes Trial Counsel did not even seek to admit the statements.[139]  This was objectively unreasonable performance.  Accordingly, the performance prong of *Strickland* has been established.

### 5. The cumulative effect of Reyes Trial Counsel's errors in the guilt phase of the Reyes Rockford Park Trial resulted in prejudice to Reyes.

It was imperative for Reyes Trial Counsel to make timely objections and utilize appropriate impeachment and exculpatory evidence.  The cumulative effect of Reyes Trial Counsel's errors during the guilt phase of the Reyes Rockford Park Trial resulted in prejudice to Reyes.  Accordingly, Reyes' convictions must be vacated.

### C. Reyes has established Ineffective Assistance of Counsel in the penalty phase of the Reyes Rockford Park Trial.

The Court finds that the errors by Reyes Trial Counsel in the penalty phase of the Reyes Rockford Park Trial resulted in cumulative prejudice to Reyes.

---

[138] Although Cabrera never admitted any involvement in the Rockford Park Murders, Cabrera's statements were nevertheless incriminating.  Cabrera's statements were against Cabrera's penal interests in that Cabrera admitted to purchasing drugs, unlawfully possessing a handgun, assaulting Rowe during a confrontation prior to the Rockford Park Murders, and assaulting Walker.

[139] The Trial Court addressed Cabrera's statements at a postconviction evidentiary hearing on August 28, 2012.  *See* Evid. Hrg. Tr. Aug. 28, 2012 at 8:10-11; 15-20.

**1. Reyes Trial Counsel was ineffective for failing to limit the presentation to the jury of Reyes' role in the Otero murder.**

Reyes Trial Counsel did not file a motion *in limine*, or otherwise argue, that evidence regarding Reyes' role in the Otero murder was inadmissible. As detailed above,[140] Reyes explained to the jury during his allocution that he wanted to testify to profess his innocence during the guilt phase, but refrained from doing so to avoid presentation of his role in the Otero murder.[141] While no evidence of Reyes' Otero conviction was admitted during the guilt phase of the Reyes Rockford Park Trial,[142] and would have been inadmissible during the guilt phase,[143] the State's penalty phase opening statement immediately began with the murder of Otero by Reyes.[144] The State's presentation also included details of the Otero murder, including that Reyes physically held Otero down while Cabrera suffocated Otero with a plastic bag, then Cabrera and Reyes took Otero's body to New Jersey where they disposed of Otero's body in a dumpster and incinerated him.[145] The State

---

[140] *See supra* Section III(A).

[141] Penalty Phase Tr. Oct. 25, 2001 at 96:3-11.

[142] *Reyes Sentencing*, 2002 WL 484641, at *11 (noting that information regarding the murder of Otero was introduced during the penalty phase).

[143] *See e.g.*, D.R.E. 404(b) (providing that evidence of a defendant's previous crime is inadmissible to prove a defendant's the character or that a defendant acted in conformity with a crime. However, evidence of a defendant's previous crimes is admissible for other purposes, including "proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."); D.R.E. 609(a) (stating that a defendant's previous convictions are only admissible for the purposes of impeachment when: (1) the previous conviction was a felony and the court determines that the probative value outweighs its prejudicial effect; or (2) the crime involves dishonesty or false statement).

[144] Penalty Phase Tr. Oct. 23, 2001 at 12:19.

[145] *Id.* at 12:23-14:7.

further explained to the jury that while Reyes could have received the death penalty for the death of Otero, he was actually only sentenced to twelve years because of a plea agreement.[146] Then, Reyes Trial Counsel read a portion of the transcript from Reyes' Otero sentencing that included that Reyes participated in the Otero murder because of Cabrera's influence; Reyes fully cooperated in the investigation into Cabrera; Reyes gave a detailed confession to the murder of Otero; Otero's daughter gave a "wrenching" testimony of dreaming of walking down the aisle with her father; Otero's "charred remains" were found in New Jersey; and Reyes "physically was a principal in the murder by holding down Mr. Otero."[147]

"The record of any prior criminal convictions and pleas of guilty or pleas of nolo contendere of the defendant or the absence of any such prior criminal convictions and pleas shall also be admissible in evidence [during the penalty phase]."[148] However, even though Reyes' conviction and guilty plea in connection with the Otero murder were likely admissible during the penalty phase, Reyes Trial Counsel should at least have made an effort to limit the presentation to the jury of *highly* prejudicial details of the Otero murder on the basis that the danger of unfair

---

[146] *Id.* at 15:2-7.
[147] Penalty Phase Tr. Oct. 25, 2001 at 6:21-11:20.
[148] 11 *Del. C.* § 4209(c)(1).

48

prejudice substantially outweighed the probative value.[149]  Accordingly, Reyes has established the performance and prejudice prongs of *Strickland*.

**2. Reyes Trial Counsel's representation with respect to mitigation during the penalty phase of the Reyes Rockford Park Trial was ineffective.**

Reyes Trial Counsel was ineffective under the prevailing professional norms because their mitigation presentation was based on an incomplete and inadequate investigation that failed to consider Reyes' youth and brain development. Moreover, Reyes Trial Counsel missed crucial opportunities to rebut the State's presentation of aggravating factors.  Reyes Trial Counsel presented a one-dimensional, negative portrayal of Reyes in an effort to demonstrate to the jury that Reyes never had a chance and, therefore, the strategy was "to focus on, instead of the positive aspect of Luis Reyes, the negative things that happened to [Reyes] in his life."[150]  This presentation did not meet prevailing professional norms and was prejudicial to Reyes.

**a. The Standard for Mitigation in a Capital Case**

The United States Supreme Court has recognized that defense counsel in a capital case is "obligat[ed] to conduct a thorough investigation of the defendant's background."[151]  In 1989, the American Bar Association promulgated guidelines

---

[149] *See* D.R.E. 403.
[150] Ev. Hrg. Tr. May 9, 2012 at 136:2–13.
[151] *Williams v. Taylor*, 529 U.S. 362, 396 (2000).

49

for defense attorneys in capital cases ("ABA Guidelines").[152]  Section 11.4.1 of the

ABA Guidelines provides:

> A. Counsel should conduct independent investigations relating to the guilt/innocence phase and to the penalty phase of a capital trial. Both investigations should begin immediately upon counsel's entry into the case and should be pursued expeditiously.
>
> B. The investigation for preparation of the guilt/innocence phase of the trial should be conducted regardless of any admission or statement by the client concerning facts constituting guilt.
>
> C. The investigation for preparation of the sentencing phase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered. This *investigation should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence* that may be introduced by the prosecutor.

The ABA Guidelines serve to "enumerate the *minimal* resources and practices necessary to provide effective assistance of counsel."[153]  Although failure to follow the ABA Guidelines is not tantamount to ineffective assistance of counsel *per se*;[154] the ABA Guidelines set a standard for evaluation of Reyes Trial Counsel's representation regarding its mitigation investigation.[155]  According to the ABA Guidelines, defense counsels' "duty to investigate is not negated by the

---

[152] *See Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* (1989) (hereinafter *ABA Guidelines*).

[153] *Id.* (emphasis added).

[154] *State v. Taylor*, 2010 WL 3511272, at \*17 (Del. Super. Aug. 6, 2010) ("Neither the United States Supreme Court nor the Delaware Supreme Court has held that failure to meet the ABA Guidelines in legally tantamount to ineffective assistance of counsel.").

[155] *Strickland*, 466 U.S. at 688 ("Prevailing norms of practice as reflected in the [ABA Guidelines] and the like . . . are guides to determining what is reasonable.").

expressed desires of a client. Nor may [defense] counsel sit idly by, thinking that the investigation would be futile. The attorney must first evaluate the potential avenues of action and then advise the client on the merits of each."[156] Moreover, the ABA Guidelines suggest that the mitigation investigation "should comprise efforts to discover *all reasonably available* mitigating evidence *and* evidence to rebut any aggravating evidence that may be introduced by the [State]."[157] The ABA Guidelines recommend obtaining the following sources for investigative information: all charging documents;[158] information from the accused concerning the incident relating to the offense charged;[159] and records—including but not limited to—medical records, birth records, school records, employment and training records or reports, family and social history, prior records, and religious or cultural influences.[160] The ABA Guidelines further suggest obtaining the names of sources to contact for verification of the information in the collected records.[161]

**b. Reyes Trial Counsel's mitigation strategy was not based on a reasonable mitigation strategy and instead was counterproductive by presenting Reyes as a man with inevitable propensity for violence.**

Reyes Trial Counsel pursued a mitigation strategy that compared Reyes' background with the findings of a report issued in April 2000 by the Office of

---

[156] *ABA Guidelines*, *supra* note 152 at § 11.4.1, cmt. (internal quotation omitted).
[157] *Id.* at § 11.4.1(C) (emphasis added).
[158] *Id.* at § 11.4.1(D)(1)(A)–(C).
[159] *Id.* at § 11.4.1(D)(2)(B).
[160] *Id.* at § 11.4.1(D)(2)(C).
[161] *Id.* at § 11.4.1(D)(2)(E).

Juvenile Justice and Delinquency Prevention of the United States Department of Justice ("Youth Violence Report").[162] The Youth Violence Report, *Predictors of Youth Violence*, identified risk factors that "confidently predict which youth would be prone to commit violent acts."[163] The Youth Violence Report identified violence-predicting risk factors within each of five domains: individual factors, family factors, school factors, peer-related factors, and community and neighborhood factors.[164] According to the Youth Violence Report "[t]he risk of violence is also compounded by the number of risk factors involved [with the youth]."[165] Reyes Trial Counsel presented to the jury that the characteristics and life of Reyes closely matched the Youth Violence Report risk criteria, which demonstrated Reyes' potential for future violence.[166] As Reyes Trial Counsel explained at the postconviction evidentiary hearing:

> And I think we decided that . . . was going to be the strategy to say, do you know what, instead of saying what a good guy . . . [Reyes] was or how responsible [Reyes] was, that what we were focusing on was - - as I sit here, this is my recollection - - what a pretty lousy childhood [Reyes] had and how the cards were stacked against [Reyes]. And

---

[162] Office of Juvenile Justice & Delinquency Prevention, U.S. DOJ, *Predictors of Youth Violence*, Juvenile Justice Bulletin (April 2000) (hereinafter *Youth Violence Report*).
[163] *Id.* at 1.
[164] *Id.* at 2. The Youth Violence Report also identified situational factors, which are "circumstances that surround a violent event and influence the outcome of that event." *Id.* at 5 (providing that situational factors may include "consumption of alcohol or other drugs by the offender or victim, the behavior of bystanders, the motives of the offender" but noting that such situational factors are "difficult to assess").
[165] *Id.* at 7 ("The larger the number of risk factors to which an individual is exposed, the greater the probability that the individual will engage in violent behavior.").
[166] Ev. Hrg. Tr. May 9, 2012 at 122:17–123:1, 124:12–18.

[Reyes] met most of the risk factors for that [Youth Violence Report], which would indicate tendency for violence or future violence.[167]

### i. Dr. Caroline Burry's testimony focused on Reyes' amenability to violence and was based on a cursory investigation.

Reyes Trial Counsel hired Dr. Caroline Burry as a mitigation specialist to assist with the mitigation investigation. According to Dr. Burry, Reyes Trial Counsel specifically hired Dr. Burry to "determine the factors and events in [Reyes'] developmental, family, and/or social history which may have influenced his subsequent functioning as an adult."[168] The majority of Dr. Burry's mitigation investigation consisted of twenty (20) hours of interviews.[169] Specifically, in addition to interviewing Reyes, Dr. Burry interviewed: (1) Reyes' mother, Ruth Reyes, (2) Reyes' grandmother, Candida Reyes, (3) Reyes' aunts, Luz Diaz and (4) Damarias Reyes, (5) Reyes' girlfriend/fiancé, Elaine Santos, (6) Reyes' daughter, Desiree Reyes, and (7) Reyes' stepson, Raymond Sanchez.[170] Dr. Burry also reviewed family photographs and Reyes' presentencing investigation report ("PSI Report"). Dr. Burry compiled her findings in an informal document titled *Draft of Dr. Caroline Burry Personal Notes* ("Dr. Burry Notes").[171]

---

[167] *Id.* at 120:9–121:1–2.
[168] *See* Dr. Caroline Burry Draft of Personal Notes (Aug. 27, 2001), Reyes App. 4, (hereinafter *Dr. Burry Notes*).
[169] *Id.*; Penalty Phase Tr. Oct. 24, 2001 at 96:4–8, 96:14.
[170] *Dr. Burry Notes supra* n.168; Penalty Phase Tr. Oct. 24, 2001 at 96:4–8, 96:14.
[171] *See Dr. Burry Notes supra* n.168.

During the penalty phase, Dr. Burry testified on behalf of Reyes as an expert in family assessment. To explain her findings to the jury, Dr. Burry created a genogram[172] that showed four generations of Reyes' family and identified repetitive themes throughout the family.[173] Dr. Burry testified that Reyes' genogram contained repetitive themes of criminal history, substance abuse, and relationships Reyes' mother had with "substitute father figure[s]."[174] Moreover, Dr. Burry testified that the father role in Reyes' life was later filled by Cabrera.[175]

Dr. Burry testified that, in her professional opinion, "Reyes' family history reveal[s] a number, in fact, a strikingly large number of risk factors predictive of violence."[176] Indeed, Dr. Burry presented to the jury a number of charts that highlighted the factors indicated in the Youth Violence Report and the applicability of each factor as to Reyes. Dr. Burry testified that Reyes had been exposed to twenty out of twenty-seven risk factors identified by the Youth Violence Report. Specifically, Reyes experienced five out of the eight individual risk factors; all seven of the family risk factors; all four of the school risk factors; one of the three peer-related factors; and three out of the five community and neighborhood risk

---

[172] "The genogram is [the] social work term for a family tree . . . . geno meaning generations and gram meaning written." Penalty Phase Tr. Oct. 24, 2001 at 98:1–3.
[173] *Id.* at 100:4–21.
[174] *Id.* at 100:22–101:14; 104:12–105:3.
[175] *Id.* at 135:14–21.
[176] *Id.* at 107:16–18.

factors.[177]  Dr. Burry also elaborated on the risks associated with having a teen mother, noting that Reyes' mother was sixteen when she gave birth to Reyes.

Dr. Burry noted that a full assessment of a youth requires consideration of protective factors, which are factors that "may help to balance against risk[,]" because "even a child out of a negative background might still do well if he or she has a number of strong protective factors."[178]  In this case, Dr. Burry testified that out of four groups of factors, which each contain multiple protective factors, Reyes qualified for only two protective factors.[179]  Dr. Burry provided that it was her professional opinion "that Reyes had numerous risk factors and very few protective factors . . . particularly at the individual and family level, [and] that [Reyes] was at very high risk *and did in fact become* dangerous."[180]

In addition to this Court's concern with the counterproductive presentation of Dr. Burry's testimony that Reyes was seemingly inevitably violent, this Court is also concerned with the adequacy of Dr. Burry's mitigation investigation as it relates to the information obtained through a limited number of interviews from one narrow source – relatives.  Even though Dr. Burry presented a genogram

---

[177] *Id.* at 119:6–127:5.
[178] *Id.* at 130:9–131:1.
[179] First, Reyes was socially bonded to his high school; and second, Reyes was subject to early intervention because he attended pre-school.  *See* Penalty Phase Tr. Oct. 24, 2001 at 131:2–135:13 (explaining that Reyes lacks intelligence, social orientation, a resilient temperament, a pro-social family, and exposure to parental values and standards of no violence and/or the promotion of abstinence from drugs).
[180] *Id.* at 136:7–12 (emphasis added).

addressing four-generations of Reyes' family, Dr. Burry conducted interviews with only seven of Reyes' family members.

This Court is also concerned with the limited scope of records that Dr. Burry reviewed. Dr. Burry testified that she obtained her information to compile Reyes' social history from her interviews, the materials within Reyes' PSI Report, and family photographs.[181] Dr. Burry wanted more records to review; she noted: "Information needed: 1. Criminal records on the entire family [and] 2. Medical records."[182] Dr. Burry never obtained any of these records.[183] Accordingly, the information presented was inadequate and insufficient.

Dr. Burry's narrow set of investigative sources is troubling. Dr. Burry was retained to complete a *social* history of Reyes; however, a mitigation investigation should be broader than social information. Mitigation investigations should include the discovery of "all reasonably available mitigating evidence *and* evidence to rebut any aggravating evidence that may be introduced[.]"[184] It is ineffective for defense counsel to abandon an investigation after gathering "'rudimentary knowledge of [the defendant's] history from a narrow set of sources.'"[185] This is because such a cursory mitigation investigation makes it

---

[181] *See id.* at 96:1–11.
[182] *Dr. Burry Notes*, *supra* note 168.
[183] Ev. Hrg. Tr. May 9, 2012 at 125:16–126:8.
[184] *ABA Guidelines*, *supra* note 152 at § 11.4.1(C).
[185] *Ploof v. State*, 75 A.3d 840, 852 (Del. 2013) (quoting *Wiggins v. Smith*, 539 U.S. 510, 524 (2003)).

impossible for defense counsel to make a fully informed decision with respect to a mitigation strategy.[186]

Moreover, "[i]n assessing the reasonableness of an attorney's investigation, however, a court must consider not only the . . . evidence already known to counsel but also whether the known evidence would lead a reasonable attorney to investigate further."[187]  Here, the information Dr. Burry began to uncover during her limited mitigation investigation—family drug abuse, physical and verbal abuse, and child abandonment—is exactly the type of information that would lead reasonable attorneys to pursue additional mitigation investigation.[188]  The failure to do so did not meet prevailing professional norms.

### ii. Dr. Harris Finkelstein's testimony offered a rudimentary explanation for Reyes' behaviors and relied on Dr. Burry's cursory investigation and Reyes' unsubstantiated self-report.

Dr. Harris Finkelstein testified during the penalty phase as an expert in the field of psychology.  Reyes Trial Counsel retained Dr. Finkelstein to "determine some type of insight into . . . what would contribute to [Reyes] doing the kinds of

---

[186] *Wiggins*, 539 U.S. at 527–28.

[187] *Id.* at 527.

[188] *See id.* at 523–25 (finding defense counsel's mitigation investigation fell short of professional standards where it relied only on the defendant's PSI and records from social services regarding defendant's time in foster care, which provided that defendant's mother was a chronic alcoholic; defendant was transferred from foster home to foster home and displayed emotional difficulties; defendant had frequent, lengthy absences from school; and, on at least one occasion, defendant's mother left him and his siblings alone for days without food).

behaviors which at that point [Reyes] was accused of and later convicted of."[189]

Dr. Finkelstein testified as to his opinion on Reyes' psychological adjustment, which he explained as the "clear end point in terms of a person's behavior . . . . [and how to] understand those kinds of behaviors . . . . not necessarily excusing the behavior, [but] simply trying to explain it [to] reach a deeper level of understanding."[190]  In forming his opinion, Dr. Finkelstein performed a limited review, including an interview of Reyes for a total of four hours during which Dr. Finkelstein conducted projective psychological tests, and a review of a report prepared by court personnel in connection with sentencing, as well as other records kept by the various courts.[191]

Dr. Finkelstein explained that Reyes tends to think of himself in two divided psychological standpoints.[192]  According to Dr. Finkelstein, these two psychological standpoints are in conflict and, as a result of this conflict, Reyes became "dependent upon the validation and affirmation of other people who are important to him."[193]  As an example, Dr. Finkelstein explained that Reyes' success in high school wrestling earned him the support and recognition that fed into Reyes' positive self-concept and helped him make good choices.  Dr.

---

[189] Penalty Phase Tr. Oct. 24, 2001 at 150:17–20.
[190] *Id.* at 163:13–164:2.
[191] *Id.* at 160:22–163:10.
[192] According to Dr. Finkelstein, on one hand, Reyes appears to feel quite good about himself, thinks he is capable, and carries himself in a confident fashion.  On the other hand, Reyes carries significant self-doubt and sees himself as someone who simply cannot succeed.
[193] Penalty Phase Tr. Oct. 24, 2001 at 164:22–165:1.

Finkelstein also explained that Reyes' home life and background pulled Reyes to his more withdrawn, hopeless, and despondent side.[194]

Finally, Dr. Finkelstein addressed Reyes' relationship with Cabrera to demonstrate the complexities of Reyes' divided psychological self-perception. According to Dr. Finkelstein, Cabrera provided Reyes with an important source of support and validation that Reyes desired but the "dilemma was when Cabrera started to give [Reyes] validation that was in part based on [Reyes] being able to win [Cabrera's] support by doing very, very awful things."[195] Moreover, Dr. Finkelstein offered an opinion that Reyes possessed impulsive tendencies and may have suffered from Attention Deficit Hyperactivity Disorder ("ADHD"). Dr. Finkelstein explained that Reyes was someone with "narcissistic vulnerability" whose background created "somebody who is very much compromised in terms of their abilities to use other people [for support or advice], compromised in terms of decision-making abilities and [somebody] . . . very much in conflict over how to sustain good feelings about himself."[196]

Decisional law mandates that defense counsel's strategic decisions properly involve consideration of the defendant's own statements, actions, and

---

[194] *See id.* at 165:8–11:7.
[195] *Id.* at 166:8–15.
[196] *Id.* at 170:10; 166:15–169:11, 169:16–20.

preferences;[197] however, the mitigation investigation should not be limited to the degree of information offered by the defendant as to his own past.[198] Nevertheless, during cross-examination at the Reyes Rockford Park Trial, Dr. Finkelstein conceded that his testimony represented mere opinions as to Reyes' psychological adjustment more than true medical diagnoses because Dr. Finkelstein's conclusions were "based mostly on the defendant['s] data utilizing just a few selected points from history."[199]

Dr. Finkelstein further explained that he did not review any of Reyes' medical or school records, and that he did not have conversations with any of Reyes' family members. Rather, Dr. Finkelstein reviewed only a brief version of facts presented to him by Reyes Trial Counsel and Dr. Burry. Indeed, Dr. Finkelstein testified that he did not necessarily have full confidence that he received "all the matters about [Reyes'] factual history."[200]

---

[197] *Strickland*, 466 U.S. at 691.

[198] *See Porter v. McCollum*, 558 U.S. 30, 40 (2009) (the United States Supreme Court explained that a "fatalistic or uncooperative [client] . . . does not obviate the need for defense counsel to conduct *some* sort of mitigation investigation."); *see also Rompilla v. Beard*, 545 U.S. 374, 381-83, 89–90 (2005) (determining that the defense counsel's mitigation investigation was deficient notwithstanding the defendant's minimal contributions and unwillingness to address his past and providing "[n]o reasonable lawyer would forgo examination of the file[s] thinking he could do as well by asking the defendant or family[,]" despite knowing that the State intends to introduce prior convictions and damaging testimony).

[199] Penalty Phase Tr. Oct. 24, 2001 at 194:9–13.

[200] *Id.* at 178:16–179:16.

It was the responsibility of Reyes Trial Counsel to make this information available for a complete review. The failure to provide the information necessary for Dr. Finkelstein to act as an effective witness for Reyes was unreasonable.

### iii. Reyes Trial Counsel failed to contact mitigation witnesses.

Reyes Trial Counsel presented only three family members on behalf of Reyes during the penalty phase. Candida Reyes, Reyes' grandmother, testified regarding her relationship with Reyes as well as Reyes' difficult childhood without a father and with a mother who was always partying.[201] Elaine Santos, Reyes' fiancé/girlfriend and mother of Reyes' two children, testified that Reyes supported their family financially and emotionally and that Reyes had a close relationship with his children.[202] Reyes' stepson, Raymond Sanchez, described his relationship with Reyes and said that he (Raymond) "would not feel good" if he could no longer see Reyes.[203]

Presentation of three family members was inadequate for the jury to have a complete picture of Reyes. Many additional witnesses were available to discuss Reyes' dysfunctional upbringing, as well as Reyes' leadership skills developed on the wrestling team and his ability to act as a role model for the younger wrestlers on the team.

---

[201] *See id.* at 216:11–234:23.
[202] *See id.* at 19:13–32:2.
[203] *See id.* at 32:20–38:13.

First, Reyes Trial Counsel failed to call George Lacsny, a teacher at Reyes' high school and Reyes' wrestling coach. At the postconviction evidentiary hearing, Mr. Lacsny testified that he does not think Reyes Trial Counsel ever contacted him to testify at the Reyes Rockford Park Trial because, as he stated, "If they did, I said I would."[204] Second, Reyes Trial Counsel failed to call Victor Reyes (of no relation to defendant Reyes), Reyes' wrestling coach during the 1995-1996 winter wrestling season.[205] Third, Reyes Trial Counsel failed to call Kathleen Corvelli-Reyes (Victor Reyes' wife and no relationship to Reyes) who became close with Reyes as a result of her husband's coaching. Although Ms. Corvelli met Reyes Trial Counsel before the Reyes Rockford Park Trial, they did not ask her to testify.[206] At the evidentiary hearing, Ms. Corvelli stated that she would have testified on behalf of Reyes.[207] Fourth, Reyes Trial Counsel failed to call Paul Perets, a teacher, band director, and timekeeper for the wresting team at A.I. DuPont High School. These additional witnesses would have allowed the jury an understanding of Reyes as a high school student and successful wrestler.

---

[204] Ev. Hrg. Tr. Sept. 29, 2012 at 23:18–23.

[205] Victor Reyes admitted that in December 1996, after Reyes had graduated high school, Victor was charged with third degree sexual assault. Pedersen–of Reyes Trial Counsel–represented Victor on the charges and in June 1997, Victor resolved the charges by entering a plea. Reyes Trial Counsel did not contact Victor to testify on Reyes' behalf at the Reyes Rockford Park Trial, but Victor provided that he would have testified if contacted. Victor opined that his own personal problems distracted him from paying better attention to Reyes and that "if I would ha[ve] been a little more involved - - I mean, at that time, that was my life, that was my job . . . and I should have known better. If I would have got a little bit more involved, I don't think we would be here now."

[206] Ev. Hrg. Tr. May 10, 2012 at 61-63.

[207] *Id.* at 63.

At the postconviction evidentiary hearing, Reyes Trial Counsel maintained that some of Reyes' Otero supporters were not interviewed because the strategy was "to focus on, instead of the positive aspect of Luis Reyes, the negative things that happened to [Reyes] in his life."[208] Reyes Trial Counsel did admit, however, that they "probably would have *or should have*" presented to the jury any and all credible admissible evidence that was supportive of their presentation of Reyes' dysfunctional childhood.[209] Moreover, Reyes Trial Counsel admitted that Ms. Covelli should have been called as a mitigation witness and, in fact, there was no excuse not to do so.[210]

Reyes Trial Counsel did not meet prevailing professional norms and their strategy was not based on an adequate investigation. Under the applicable decisional law, the deference owed to Reyes Trial Counsel's mitigation strategy depends on the adequacy of the mitigation investigation supporting their strategy.[211] A strategy that is based on a "'thorough investigation of law and facts relevant to plausible [mitigation] options [is] virtually unchallengeable[.]'"[212] Here, Reyes Trial Counsel did not perform a thorough investigaiton.

Certain mitigation strategies may limit the scope of the mitigation investigation as long as defense counsel reasonably decides that "'particular

---

[208] Ev. Hrg. Tr. May 9, 2012 at 136:2–13.
[209] *Id.* at 158:13–23.
[210] *Id.* at 164:8–167:16.
[211] *Wiggins*, 539 U.S. at 521.
[212] *Id.* (citing *Strickland*, 466 U.S. at 690–91).

investigations [are] unnecessary.'"[213]  A decision not to investigate further must be assessed for reasonableness in light of all the circumstances.[214]  Here, it was not reasonable to limit the investigation.  For instance, in *Williams v. Taylor*, the United States Supreme Court concluded, under *Strickland*, that defense counsel could not justify its failure to uncover and present certain mitigation evidence as a strategic decision because defense counsel failed to "fulfill their obligation to conduct a thorough investigation of the defendant's background" to support such a strategy.[215]  The reasoning of *Williams* is applicable here and supports a finding that the investigation was inadequate.

Accordingly, the question for this Court is not whether Reyes Trial Counsel *should have* presented *more* mitigating evidence in support of its mitigation strategy.[216]  Rather, the question is whether reasonable judgment supported the extent of Reyes Trial Counsel's mitigation investigation.  This Court finds that Reyes Trial Counsel's mitigation strategy was not reasonable, was not based on a proper investigation, and was counterproductive.

---

[213] *Id.* (citing *Strickland*, 466 U.S. at 690–91).
[214] *Id.* at 521–22.
[215] *Williams v. Taylor*, 529 U.S. 362, 395–96 (2000).
[216] *Outten v. Kearney*, 464 F.3d 401, 416–19 (3d Cir. 2006); *Wiggins*, 539 U.S. at 521–23.

**c. The jury did not have the opportunity to consider mitigating evidence regarding Reyes' adolescent brain functioning.**

There was extensive mitigating evidence that Reyes Trial Counsel would have uncovered if a proper mitigation investigation was undertaken.

**i. Dr. Jonathan Mack determined Reyes had limited executive functions.**

In connection with the postconviction motion, Rule 61 Counsel retained Dr. Jonathan Mack, a forensic psychologist and neuropsychologist. Dr. Mack testified at a postconviction hearing as a defense expert in the study of the relationship between brain function and behavior. Dr. Mack testified generally that the executive functions of the brain are the last to develop and that the frontal lobes are not mature until age twenty–five.[217]

Dr. Mack conducted a neuropsychological and psychological evaluation of Reyes in 2007, when Reyes was twenty-nine years old, to determine Reyes' executive function sequencing and mental flexibility.[218] With respect to Reyes' executive functions, Dr. Mack testified that Reyes' abilities fell in the sixth (6th) percentile among the general population and Reyes suffered mildly to moderately impaired executive functioning.[219] With respect to mental flexibility, Dr. Mack testified that, based on Reyes' score, which placed Reyes in the eighth (8th)

---

[217] Ev. Hrg. Tr. Aug. 27, 2012 at 34:5–10; *see also Roper*, 543 U.S. 551 (discussing the executive functions of the brain in extensive detail).
[218] Ev. Hrg. Tr. Aug. 27, 2012 at 8:16–10:1, 34:21–23.
[219] *Id.* at 35:8–13.

percentile, Reyes demonstrated definite mental impairment.[220] Dr. Mack also testified that he concluded that Reyes' full scale IQ—also known as Reyes' overall intellectual ability—was in the eighteenth (18th) percentile, which is the low average range.[221] Upon consideration of Reyes' records, test results, and a clinical interview of Reyes, Dr. Mack determined that, even at age twenty-nine, Reyes demonstrated difficulties with "nonverbal problem solving, abstract reasoning, concept formation and mental flexibility" and that Reyes' executive functions would have been worse in 1996, when Reyes was seventeen and eighteen years old.[222]

The jury in the Reyes Rockford Park Trial did not have the opportunity to consider the expert opinion of Dr. Mack or any other expert in this field. Reyes Trial Counsel should have presented this or similar mitigating evidence to the jury in deciding whether to recommend a death sentence for Reyes. The failure to develop this mitigating evidence fell short of objectively reasonable performance standards.

## ii. Dr. Dewey Cornell determined that Reyes' brain damage had significance for Reyes' relationship with Cabrera.

In connection with these postconviction proceedings, Dr. Dewey Cornell was retained as a forensic psychologist focused on the assessment of psychological

---

[220] *Id.* at 35:18–22.
[221] *Id.* at 21:17–19, 23:5–6; *see* Ev. Hrg. Tr. April 24, 2013 at 27:5–10.
[222] Ev. Hrg. Tr. Aug. 27, 2012 at 36:10–37:1.

evidence for the use in legal–decision making. Dr. Cornell conducted a six hour clinical interview of Reyes and interviewed Reyes' mother, Ruth Reyes; Reyes' Aunt, Luz Diaz; Reyes' cousin, Debbie Diaz; and Reyes' girlfriend/fiancé, Elaine Santos. In addition, Dr. Cornell interviewed Kathy Covelli-Reyes; the Skinners; and reviewed the relevant court proceedings and expert reports for a postconviction evidentiary hearing.

At a postconviction evidentiary hearing, Dr. Cornell testified that a neuropsychological evaluation on Reyes should have been conducted before the Reyes Rockford Park Trial because there were several indicators of brain dysfunction, prenatal marijuana exposure, teen drug use, and being held back in elementary school.[223] Dr. Cornell noted Reyes' significant "psychological dependency on [] Cabrera as magnified by his cognitive impairment and maturity."[224] In Dr. Cornell's opinion, Reyes' mild brain damage, as diagnosed by Dr. Mack, coupled with Reyes' incomplete prefrontal cortex development was significant because:

> The young man who does not have the even normal 18-year-old capacity to reflect on consequences of his actions, to separate himself from what other people are telling him to do, sort of use ordinary judgment that would lead you to act more independently rather than dependently on an authority figure or a person that you depend on.[225]

---

[223] Ev. Hrg. Tr. Aug. 2, 2013 at 22:5–23:1.
[224] *Id.* at 44:12–14.
[225] *Id.* at 21:16–22.

This would have been powerful and important information for the jury to understand Reyes' relationship with Cabrera. Reyes Trial Counsel's failure to develop this evidence fell short of reasonable performance.

### iii. Dolores Andrews testified that Dr. Burry's mitigation investigation was incomplete and it could have had an effect on the jury.

Dolores Andrews, a clinical social worker who works as a mitigation specialist, particularly in capital cases, was retained in connection with the postconviction proceedings. Ms. Andrews interviewed Reyes; Reyes' mother, Ruth Reyes; his aunts, Demaris and Luz Reyes; his cousin, Debra Diaz; and other non–family members, including employees of A.I. DuPont High School. Ms. Andrews authored a report with her findings. At a postconviction evidentiary hearing,[226] Ms. Andrews testified about Reyes' childhood, including Ruth's drug use and attempted abortions during her pregnancy with Reyes; Ruth's substance abuse; Ruth's general inability to parent Reyes; Ruth's use of corporal punishment on Reyes; the absence of Reyes' biological father; and Reyes' exposure to prostitution, drug use, and drug sales.

Ms. Andrews was critical of Dr. Burry's investigation and provided that both Reyes Trial Counsel and Dr. Burry's investigation were incomplete. Ms. Andrews testified that there were various mitigating factors that were underdeveloped during the penalty phase of the Reyes Rockford Park Trial, including Reyes' exposure to

---

[226] Ms. Andrews' complete testimony is contained in: Ev. Hrg. Tr. Aug. 2, 2012 at 80:11-152:3.

emotional and physical abuse; Candida's ability to parent or care for Reyes considering her age, and physical and mental health; Reyes' exposure to child endangerment and criminal activity from his uncle Michael Reyes; the extent of Ruth's drug addiction; the fact that despite of Reyes' unfortunate upbringing, "he tried his best to engage in lawful behavior, to be a productive citizen, to take care of himself, particularly when he had to[,]" such as keeping gainful employment;[227] Ruth's incarceration; and the impact Reyes' execution would have on members of his family.

Ms. Andrews explained that there were a number of mitigating factors that were completely ignored, including Reyes' family's difficulty in assimilating to a new country; the lack of Reyes' biological paternal family's involvement in Reyes' life; Ruth's attempted abortions while pregnant with Reyes; and Reyes' difficulty in finding an attachment with Ruth. When Reyes Rule 61 Counsel asked Ms. Andrews why it was significant that a comprehensive presentation be made for the jury with respect to Reyes' life, Ms. Andrews testified:

> Because the mitigation report and the mitigation phase addresses the penalty phase, and *originally with what the jury knew then, three people had voted to save his life. Had they known more, had these 12 jurors known more, maybe more would have voted, perhaps all, to save his life.* That is what this is in pursuit of humanizing him, putting Luis Reyes in a context that people will understand what his life was about, not simply what he is accused of and charged with. [228]

---

[227] *Id.* at 120:16
[228] *Id.* at 124:2–12 (emphasis added).

Reyes Trial Counsel did not present a comprehensive mitigation case for the jury's consideration. Even without a more rigorous presentation, three jurors voted for a life sentence. The failure to present a mitigation specialist such as Ms. Andrews did not meet prevailing professional norms.

**d. Reyes suffered prejudice as a result of Reyes Trial Counsel's deficient mitigation presentation.**

Defense counsel in capital cases have an obligation to conduct a thorough investigation for the purposes of sentencing and mitigation.[229] Per decisional law and the ABA Guidelines, this obligation involves efforts to discover *all reasonably available* mitigating evidence.[230] Reyes Trial Counsel failed to properly satisfy counsel's obligations. Instead, the mitigation presentation was deficient and counterproductive by presenting Reyes as an individual "hard wired for violence."

At best, Reyes Trial Counsel's performance left the jury with an incomplete profile and understanding of Reyes, his background, and his mental functioning. At worst, Reyes Trial Counsel's deficient performance actually served to dehumanize Reyes and to portray him as violent. The jury was not given a fair opportunity to assess Reyes' culpability for the Rockford Park Murders because the jurors did not hear complete or sufficient testimony regarding Reyes' youth, mental development, abusive, dysfunctional upbringing, and the extent of Reyes'

---

[229] *See supra* Section V(C)(2)(a) for the legal standard for mitigation in a capital case.
[230] *Wiggins*, 539 U.S. at 524 (emphasis in original); *ABA Guidelines*, *supra* note 152, 11.4.1(C).

susceptibility to Cabrera as a father figure.  Accordingly, Reyes suffered prejudice as a result of the substandard performance of Reyes Trial Counsel.

### 3. Reyes Trial Counsel failed to object to prosecutorial misconduct.

The prosecutor, on behalf of the State, made improper comments during the penalty phase of the Reyes Rockford Park Trial, denying Reyes his right to a fair and impartial trial as guaranteed by the United States and Delaware Constitutions.[231]  Reyes Trial Counsel was ineffective for failing to protect Reyes from the prosecutorial misconduct (*i.e.*, failing to object to the State's remarks during the Reyes Rockford Park Trial).  Moreover, Reyes Trial Counsel was ineffective for failing to assert these claims on direct appeal, thereby limiting Reyes' relief to the more stringent *Strickland* standard of review in these postconviction proceedings.[232]  Moreover, because Reyes' constitutional challenges were not presented below, those claims are subject to procedural default under Rule 61(i)(3) unless Reyes can demonstrate cause and prejudice or a colorable claim of a constitutional violation.[233]

---

[231] U.S. CONST. amend. VI; DEL. CONST. Art. I § 7; *Flonnory v. State*, 778 A.2d 1044, 1051 (Del. 2001) (noting that the right to a fair trial before an impartial jury is a bedrock of the American criminal justice system).

[232] Notably, despite acknowledging that his postconviction claims are subject to review under *Strickland*, Reyes focuses the majority of his argument on the grounds that he is entitled to relief under the *Wainwright/Hughes* standards, which are applicable on direct appeal.

[233] Super. Ct. Crim. R. 61(i)(3)(A)–(B); (i)(5); *Hainey v. State*, 2008 WL 836599, at *1 (Del. Mar. 31, 2008).

Reyes' claims of prosecutorial misconduct will be addressed on the merits as an ineffective counsel claim. Although the prosecution operates within an adversarial system, prosecutors must seek justice, not merely convictions.[234] In the role of "minister of justice," prosecutors must "avoid improper suggestions, insinuations, and assertions of personal knowledge in order to ensure that guilt is decided only on the basis of sufficient evidence."[235] Pursuant to ABA Standard 3-5.8(d), "[t]he prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence." Moreover, the conduct of a prosecutor is of particular importance during the penalty phase of a capital trial. This is "because of the possibility that the jury will give special weight to the prosecutor's arguments . . . because of the prestige associated with the prosecutor's office."[236] Ultimately, the trial judge determines whether the defendant will live or die only after giving substantial weight to the jury's recommendation.[237] As such, the "jury's recommendation is significant, and therefore *the conduct of the penalty phase hearing must be conducted fairly*."[238]

---

[234] ABA Standards, *Prosecution and Defense Functions*, 3-1.2(c) ("The duty of the prosecutor is to seek justice, not merely to convict."); *Whittle v. State*, 77 A.3d 239, 246 (Del. 2013) (reiterating the special weight juror's give to the prosecutor's arguments); *Brokenbrough v. State*, 522 A.2d 851, 855 (Del. 1987).

[235] *Kirkley v. State*, 41 A.3d 372, 377 (Del. 2012); *Trump v. State*, 753 A.2d 963, 968 (Del. 2000).

[236] ABA Standards, *Prosecution and Defense Functions*, 3-5.8, commentary (3ed. 1993).

[237] *Capano v. State*, 781 A.2d 556, 656 (Del. 2001) (citing 11 *Del. C.* § 4209).

[238] *Id.* (emphasis added).

### a. The State's "unpunished murder" comments were objectionable.

The State's argument to the jury that a life sentence for Reyes would leave one of the Rockford Park Murders unpunished was objectionable; yet Reyes Trial Counsel did not object. First, the State's argument was a misleading misstatement of law. Second, the State's argument was an improper plea for vengeance.

Specifically, in its penalty phase opening statement, the State remarked:

It [the death of two or more individuals] is a significant statutory aggravating circumstance. Because if [Reyes] should be sentenced to life imprisonment for the murder *of one of the two victims* in this case, either Vaughn Rowe or Brandon Saunders, [Reyes] has only one life to serve. And for the murder of the other [victim] he will receive no punishment.

Oh, the [Trial J]udge would sentence [Reyes] to life without parole, just as [the Trial Judge] would for the other [victim], but *the practical effect of that would be [Reyes] would receive no punishment for the second murder he committed in this case.*[239]

Additionally, in the State's closing argument, the State improperly emphasized the "practical" effect—rather than the "legal" effect—of recommending a life sentence:

[A]s you [the jurors] know, as was true with Brandon [Saunders] and with Vaughn [Rowe], [Reyes] only has one life to give. So that second life sentence for the second murder of the two murders [Reyes] committed on January 21, 1996, is essentially a *meaningless punishment*. If you [the jurors] do not recommend the death penalty in this case; your Honor, if you do not impose the death penalty in this

---

[239] Penalty Phase Tr. Oct. 23, 2001 at 16:12–22 (emphasis added).

case, one of those two murders will go unpunished. Justice, ladies and gentlemen, demands that *every crime* be punished.[240]

\* \* \* \*

When you convict someone of two murders, if you impose a life sentence for the first murder[,] because we each have but one life to give, there is no real punishment for that second murder.[241]

I ask you this ladies and gentlemen, [Trial Judge], whose murder will go unpunished? Will it be Brandon's? Or Vaughn's? And what have you [the jurors] heard throughout the course of this trial, particularly over the last two days, which suggests, for a minute, that [Reyes] deserves the gift, the grace of *being able to go practically and essentially unpunished for one of those two murders*? What has he done to deserve that?[242]

\* \* \* \*

Ladies and gentlemen, [Trial Judge], only a death sentence will ensure that the murders of both Brandon Saunders and Vaughn Rowe are *justly and fairly punished*. Only a death sentence can ensure that the defendant pays; yes, pays for those murders. Only a death sentence can ensure that justice is done.[243]

The State also made improper comments in its closing rebuttal argument:

We're talking about what the [Delaware] General Assembly says, your general assembly, your legislature says what constitutes appropriate procedure to prove a death penalty when one of them is where two people are killed in a particular case. And it's easy to understand why. It's easy to understand why because a life sentence for one murder *means no punishment for the other [murder]*. It's as simple as that. We're not talking about an eye for an eye. We're

---

[240] Penalty Phase Tr. Oct. 25, 2001 at 43:14–44:1 (emphasis added).
[241] *Id.* at 69:13–17.
[242] *Id.* at 69:18–70:4 (emphasis added).
[243] *Id.* at 70:5–11 (emphasis added).

talking about accountability. We're talking about *no free murders.* No opportunities to kill somebody and *not be punished.*[244]

* * * *

If you [the jurors] return a life sentence for these – if you recommend a life sentence for these murders, [Reyes] will serve a one life sentence and that life sentence will begin at sometime between 2007 and 2009. It won't even be [Reyes'] entire life because a portion of that life up until that time will be spent serving a sentence for the murder of Fundador Otero. What does it say, ladies and gentlemen? What does it say as the conscience of the community? What does it say about justice if Luis Reyes can kill and kill and kill yet again, and for the last murder, never be punished?[245]

It is well-established that a prosecutor may not misstate or misrepresent the evidence or "mislead the jury as to the inferences it may draw."[246] This Court must consider a prosecutor's statements in the context of the record as a whole and in light of all the evidence.[247] Upon review of the record and consideration of the context of the challenged statements, this Court finds the prosecutor's statements related to an unpunished murder to be, at a minimum, objectionable.

Here, the State presented to the jury evidence concerning the gravity of Reyes' criminal conduct throughout the guilt and penalty phases of the Reyes

---

[244] *Id.* at 144:21–145:11 (emphasis added).

[245] *Id.* at 153:4–15.

[246] ABA Standards, *Prosecution and Defense Functions*, 3-5.8; *Daniels v. State*, 859 A.2d 1008, 1011 (Del. 2004) (quoting *Sexton v. State*, 397 A.2d 540, 545 (Del. 1979)); *Kurzmann v. State*, 903 A.2d 702, 708 (Del. 2006); *Flonnory v. State*, 893 A.2d 507, 540 (Del. 2006); *Hunter*, 815 A.2d at 735; *Hughes v. State*, 437 A.2d 559, 567 (Del. 1981) ("It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.") (quoting *ABA Standards, Prosecution and Defense Functions* (1971)).

[247] *Daniels v. State*, 859 A.2d 1008, 1012 (Del. 2004).

Rockford Park Trial. Thereafter, however, the State focused its penalty phase arguments not on the evidence—*i.e.*, the aggravating and mitigating factors—but on the idea that Reyes can serve but one life sentence and thus, a life sentence is not a punishment for *both* murders. The State's argument that, absent the death penalty, Reyes would somehow escape punishment for one of the murders—notwithstanding the fact that Reyes faced life imprisonment—diverted the jury from deciding if the aggravating factors outweighed the mitigating factors by a preponderance of the evidence.[248] The State improperly appealed to the jury for vengeance by death (i.e., a retaliatory sentence).

As the commentary of ABA Standard 3-5.8 makes clear, "The prosecutor should not make arguments that encourage the jury to depart from its duty to decide the case on the evidence . . . . Predictions about the effect of an [outcome] . . . go beyond the scope of the issues in trial and are to be avoided."

The State's arguments were improper and Reyes Trial Counsel was objectively unreasonable for failing to object. Moreover, Reyes was prejudiced by the State's improper argument. Accordingly, Reyes has satisfied *Strickland*.

### b. The State improperly characterized Reyes' mitigation factors as excuses.

In its closing of the penalty phase, the State argued the following:

---

[248] *See Small v. State*, 51 A.3d 452, 462 (Del. 2012) ("The prosecutorial misconduct tainted the jury's vote on whether the aggravating circumstances outweighed the mitigating circumstances.").

Well, against the weight of these many aggravating circumstances, [Reyes], through his able and capable counsel . . . has introduced evidence *of what he claims are facts where were mitigating* which make the death penalty less appropriate. What did we hear?

Well, [Reyes Trial Counsel] began by saying that this evidence would not be introduced in an attempt to excuse the murders. But then consider the testimony of Caroline Burry, and *although she never said that she was trying to excuse the murders, what was your [the jurors] read on what she was really saying?*[249]

\* \* \* \*

Folks, although [Dr. Burry] didn't say it and she never did say it, [Dr. Burry's mitigation testimony] is *an attempt to excuse what [Reyes] has done* and [the State] submits you should reject that for exactly what it is.[250]

This was improper argument, yet Reyes Trial Counsel did not object. The Delaware Supreme Court addressed this issue as recently as 2012 in its decision in *Small v. State*, holding that "mitigating circumstances are different from excuses."[251] In *Small*, the State, on eight different occasions, referred to each of the defendant's mitigating circumstances individually as an excuse.[252] On direct appeal, the *Small* Court concluded that the prosecutor's repeated improper characterization of the defendant's mitigating circumstances as excuses "changed the tenor or the penalty phase" and distracted "the jury from its proper role and

---

[249] Penalty Phase Tr. Oct. 25, 2001 at 63:9–21 (emphasis added).
[250] *Id.* at 64:13–16 (emphasis added).
[251] *Small*, 51 A.3d at 460 (distinguishing the term "excuse" in the context of criminal law from a "mitigating circumstance").
[252] *Id.* at 459.

duty to weigh the aggravating and mitigating circumstances."[253] As a result, the *Small* Court remanded the matter for a new penalty hearing.[254]

The Delaware Supreme Court's concerns in *Small* are likewise applicable here. The State characterized the entirety of Dr. Burry's mitigation testimony as an attempt to "excuse" the Rockford Park Murders. Therefore, this was improper argument by the State and was objectionable. Reyes Trial Counsel was objectively unreasonable for failing to object to the State's mischaracterizations of Reyes' mitigation evidence as an excuse. Reyes suffered prejudice as a result of this improper presentation. Accordingly, Reyes has satisfied *Strickland*.

### c. The State's characterization of Reyes as "monstrous" was improper and Reyes Trial Counsel should have objected.

The State injected improper inflammatory remarks into the penalty hearing by describing Reyes as "monstrous." Specifically, Reyes challenges the following from the State's rebuttal argument:

> When you kill, and you kill, and you kill again, you are a murderer. That is what you are. You need go no further in defining him. *He is so monstrous*. It is so monumental that any definition of Luis Reyes pales into insignificance.[255]

---

[253] *Id.* at 461.
[254] *Id.* at 462.
[255] Penalty Phase Tr. Oct. 25, 2001 at 148:16–21 (emphasis added).

78

In presenting the State's case at trial, prosecutors "may argue legitimate inferences of the [defendant's] guilt that flow from the evidence."[256]  However, prosecutors must "refrain from legally objectionable tactics calculated to arouse the prejudices of the jury."[257]  For example, it is both inflammatory and impermissible for a prosecutor to engage in name-calling against the defendant because such characterizations attempt to inflame the passions of the jury.[258]  Accordingly, the State's comments in this regard were improper and Reyes Trial Counsel was ineffective by failing to object.  Moreover, Reyes suffered prejudice.

### d. The State improperly presented a "message to the community" argument.

Delaware Courts have held that it is improper for a prosecutor to appeal to a jury's sense of personal risk and "'to direct the jury's attention to the societal goal of maintain a safe community.'"[259]  Arguments that urge the jury to prevent danger in the community are objectionable because such arguments, for example, direct juror attention to matters outside the record, implicate varying levels of juror perception and personal knowledge, and suggest jurors are at personal risk.[260]

---

[256] *Daniels v. State*, 859 A.2d 1008, 1011 (Del. 2004) (internal quotations omitted).

[257] *Brokenbrough*, 522 A.2d at 855 (internal quotations omitted).

[258] *Id.* at 857 (finding that it was improper for the prosecutor to insinuate, by analogy, that the defendant was the devil).

[259] *Williamson v. State*, 1998 WL 138697, at *3 (Del. Feb. 25, 1998) (quoting *Black v. State*, 616 A.2d 320, 324 (Del. 1992)).

[260] *Black v. State*, 616 A.2d 320 at 324 (Del. 1992).

The State improperly appealed to the jury's sense of community. In the final paragraph of its rebuttal at the penalty phase, the State rhetorically asked the jury, "What does it say, ladies and gentlemen? *What does it say as the conscience of the community*? What does it say about justice if Luis Reyes can kill and kill and kill yet again, and for the last murder, never be punished?"[261] These statements were objectionable; it was objectively unreasonable for Reyes Trial Counsel to withhold an objection, and Reyes suffered prejudice. Therefore, *Strickland* is satisfied.

**4. Reyes Trial Counsel failed to rebut the State's improper and inaccurate characterization of Reyes' prison record.**

While discussing Reyes' prison record during its penalty phase closing argument, the State argued the following:

> What's worse and perhaps what's more significant is what's not here. There is no evidence that the defendant, since he was incarcerated in 1997, has undertaken any significant efforts whatsoever to rehabilitate himself. Now, remember, he told Dr. Finkelstein and you'll see [. . . ] Dr. Feinkelstein's report, that he was convinced you all would exonerate him and that he would be released from prison some day. But he didn't do anything of any significance to make himself a better person in anticipation of his eventual release. No anger counseling, no psychological counseling, no psychiatric counseling, no Key program, no Crest program, no certificates of achievement, nothing. Nothing.[262]

---

[261] Penalty Phase Tr. Oct. 25, 2001 at 152:11–15 (emphasis added).
[262] *Id.* at 58:1-16. The State offered a similar argument in its rebuttal argument of the penalty phase, stating:

> What's more important is where are the attempts to rehabilitate himself?
> Until Friday, if you believe him, he expected to walk out of jail at the end of his
> 12-year sentence. So where are the attempts to rehabilitate himself? Where are

Accordingly, this presentation offered a false impression that Reyes had not attempted to rehabilitate himself and would not do so if given a life sentence; therefore, according to the State, execution was the most appropriate sanction.

However, Reyes' prison records reflect that Reyes participated in various education programs from 1999 to 2002. Importantly, most of Reyes' time in prison before the Reyes Rockford Park Trial was as a pre-trial detainee for both the Otero murder and the Rockford Park Murders. As a pre-trial detainee, Reyes was not even eligible for rehabilitative programs at HRYCI. Moreover, at a postconviction evidentiary hearing, correctional consultant James Aiken testified that Reyes had enrolled in vocational programs as a sentenced inmate at HRYCI.

Reyes has established the performance prong of *Strickland*. Where Reyes Trial Counsel, by their own admission, failed to even investigate Reyes' involvement in any prison programs as a mitigating factor in a pending death penalty matter, their representation fell below an objective standard of reasonableness. Reyes Trial Counsel had an obligation to Reyes to gather information which would rebut the State's characterization of Reyes. Ideally, Reyes Trial Counsel would have objected to the State's presentation regarding

---

the certificates from anger management classes, occupational therapy, [sic], anything good? Where are those records?

*Id.* at 146:6-12.

rehabilitative efforts by Reyes and obtained a ruling by the Trial Court that the probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.[263]  Had the Trial Court declined to prohibit this presentation, then Reyes Trial Counsel should have presented evidence to explain to the jury Reyes' status as a pre-trial prison detainee made him ineligible for rehabilitative programs.

The failure of Reyes Trial Counsel to challenge the State's comments on Reyes' alleged failure to participate in rehabilitative programs fell below the expectations of reasonable performance.  Moreover, Reyes was prejudiced because the State relied on this information to argue that a death sentence was mandated because Reyes would not make any effort to be rehabilitated during a life sentence.

### 5. Reyes Trial Counsel failed to object to the State's improper rebuttal to Reyes' allocution.

Reyes exercised his right to allocate during the penalty phase.[264]  Before doing so, the Trial Court engaged in a detailed colloquy regarding the parameters of allocution.[265]  Reyes expressed that he had discussed with Reyes Trial Counsel the potential risks and benefits of personally addressing the jury.  The Trial Court

---

[263] *See* D.R.E. 403.

[264] The right to allocution is not constitutional but, rather, is a substantial right grounded in Superior Court Criminal Rule 32(a)(1)(c), Delaware's death penalty statute, codified at 11 *Del. C.* § 4209(c)(2), and Delaware decisional law.  *See Shelton v. State*, 744 A.2d 465, 491–98 (Del. 1999).

[265] *See* Penalty Phase Tr. Oct. 25, 2001 at 73:21–87:9.

also engaged in a colloquy with Reyes about allocution.[266]  Reyes Trial Counsel

also specifically addressed on the record that Reyes has been advised that he could

be cross-examined under oath if Reyes' allocution went beyond the record.  The

State expressly agreed with Reyes Trial Counsel that should Reyes exceed the

parameters of allocution, then Reyes must be cross-examined under oath.[267]

After Reyes personally addressed the jury, the State raised issue with the

following statements:

> REYES:  I've made many bad choices in my life and I'm guilty of
> many things, and out of all of those bad choices that I've made, I
> admitted to my wrong.  Whether it was exactly at that time or a little
> later down the line, I admitted to what I did.  I came forward.[268]
>
> *Before this trial started, [the State] came to me with a plea of life in
> prison*, to spend the rest of my life in jail, *but I turned that plea down*.
> My lawyers advised me of the evidence that [the State] had and that it
> didn't look good, but regardless of that, I would not take that plea.  I
> told them I would not take a plea for something that I did not do.  So
> we came to trial.[269]

Specifically, the State submitted and the Trial Court agreed that Reyes had

introduced a new matter into evidence—a plea offer from the State rejected by

Reyes.  However, the State never formally extended a plea offer to Reyes.

Nevertheless, while it is technically accurate that a *formal* plea had never

been extended, there had, in fact, been plea discussions.  Indeed, it was made clear

---

[266] *Id.* at 81:16–82:11.

[267] *Id.* at 84:10–11; *see Shelton*, 744 A.2d at 496.

[268] Penalty Phase Tr. Oct. 25, 2001 at 95:11–16.

[269] *Id.* 95:17–96:2 (emphasis added).

by the State that, if Reyes would admit responsibility for the Rockford Park Murders, then the State would agree to a life sentence and would not seek Reyes' execution. However, Reyes claimed factual innocence and refused to accept responsibility for crimes he contended he did not commit.

To correct the record, per the State's request and as agreed upon by Reyes Trial Counsel, the State read to the jury—and into the record—a letter the State wrote to Reyes Trial Counsel on September 17, 2001, before the Reyes Rockford Park Trial began. Therefore, despite the acknowledgement of all parties and the Trial Court, the correct procedure was not followed; Reyes was not placed under oath and cross-examined.

Not only did Reyes Trial Counsel fail to insist upon correct procedure, but the September 17th letter inserted improper commentary and vouching by the State that was inappropriate. The State's rebuttal argument was as follows:

> [Reyes' allocution] talked about a plea agreement, a plea offer. And [Reyes] was wrong about that. [Reyes] presented incorrect information. And because of that, [the State is] permitted to set the record straight . . . so that you're not under any misapprehensions about what the State's position is in this case.
>
> What I'm going to read to you [] is a letter sent to [Reyes Trial C]ounsel on September the 17th of this year to [Reyes Trial Counsel] from [the State].
>
> "We also want to comment on [Reyes Trial Counsel's] arguments concerning a prior plea offer. To be precise, no plea was ever offered. We did ask whether your client would be willing to discuss a possible plea to a life sentence coupled with a proffer to the victim's families

84

in some undetermined form as to the specifics of what happened and why. Your client expressed no interest in opening those lines of communication, so no plea was ever offered. While we might be willing to talk about waiving the death penalty for someone who accepts responsibility for his actions and helps grieving families cope with their losses, we are not willing to do so for a person we believe to be a triple murderer who does not accept that responsibility. Without an acceptance of responsibility, we believe that the death penalty for your client is absolutely required. It seems to us that while we will be able – that we will be able to seat an unbiased jury. If your client wants to avoid the possibility of a death penalty, we believe he should rethink his earlier position rather than seek unilateral concessions from the State."[270]

A prosecutor—seeking justice in his or her "unique role in the adversary system"—may argue to the jury "all legitimate inferences of the defendant's guilt that follow from the evidence."[271] A prosecutor must not, however, engage in vouching by "impl[ying] personal superior knowledge, beyond what it logically inferred from the evidence at trial."[272] ABA Standards also warn against a prosecutor sharing his or her personal opinions or beliefs "as to the truth or falsity of any testimony or evidence or the guilt of the defendant."[273]

---

[270] *Id.* at 142:8–143:20.
[271] *Burns v. State*, 76 A.3d 780, 789–90 (Del. 2013); *Kirkley*, 41 A.3d at 377 (referencing *Daniels v. State*, 859 A.2d 1008, 1011 (Del. 2004) (quoting *Hooks v. State*, 416 A.2d 189, 204 (Del. 1980)), and *Boatson v. State*, 457 A.2d 738, 742 (Del. 1983)).
[272] *Burns*, 76 A.3d at 789–90; *Kirkley*, 41 A.3d at 377; *White v. State*, 816 A.2d 776, 779 (Del. 2003); *Flonnory*, 893 A.2d at 539 ("It it well-settled that prosecutors may not express their personal opinions or beliefs about the credibility of witnesses or about the truth of any testimony.").
[273] ABA Standards Prosecution Function, 3-5.8(b), *available at* http://www.americanbar.org/publications/criminal_justice_section_archive/crimjust_standards_pfunc_blk.html.

In *Kirkley v. State*, the Delaware Supreme Court held that the prosecutor's statement—that the State only pursued criminal charges against the defendant because the defendant was actually guilty—constituted improper vouching of the defendant's guilt.[274] The Delaware Supreme Court recently addressed this issue in *McCoy v. State*.[275] The *McCoy* Court found that the prosecutor vouched for the testimony of a State witness by expressing a personal opinion on the defendant's guilt, which "implicitly and inappropriately corroborated [the State witness'] testimony and endorsed [the State witness'] credibility."[276] The *McCoy* Court determined that the prosecutor's statements, like statements made in *Kirkley*, implied superior knowledge of the evidence.[277]

In *Burns v. State*, the Delaware Supreme Court held that the prosecutor's statements—that the defendant "did this" and was responsible for the criminal conduct as charged—did not imply superior knowledge of the evidence but, rather,

---

[274] *Kirkley*, 41 A.3d at 377–78 (concluding that the prosecutor's comments regarding the State's charging decisions suggested superior knowledge of the evidence and resulted in "an improper inference" that could not be drawn from the evidence).

[275] 112 A.3d 239 (Del. 2015).

[276] *McCoy*, 112 A.3d at 261.

[277] *Compare McCoy*, 112 A.3d at 261 (finding misconduct because the prosecutor vouched for the State's witness by expressing his personal opinion that the defendant shot the victim, which implied superior knowledge of the evidence); *Kirkley*, 41 A.3d at 377–78 (finding misconduct because the prosecutor vouched for the State's case by staying that the State pursued criminal charges only when the defendant was indeed guilty, which implied superior knowledge of the evidence); *and Whittle*, 77 A.3d at 247–48 (finding misconduct because the prosecutor expressly endorsed the testimony of the State's witness that the defendant was guilty); *with Burns*, 76 A.3d at 790–91 (determining the prosecutor's statements that the defendant committed the criminal conduct charged was logically inferred from the evidence).

constituted a logical inference from the evidence.[278]  The *Burns* Court noted that the prosecutor did not speak in the first person and "couched his statements by saying 'what the attorneys say is not evidence[,]'" and determined that such a warning bolstered the *Burns* Court's conclusion.[279]  Unlike the prosecutor's statements in *Burns*, the State's September 17th letter, written in the first person, contained the State's personal opinion that Reyes' case "absolutely required" the death penalty.[280]

It was objectively unreasonable for Reyes Trial Counsel to agree to the State's reading of its September 17th letter into the record to "cure" Reyes' statements that the Trial Court found had exceeded the bounds of allocution. Reyes Trial Counsel was ineffective by agreeing with the State that reading the State's letter into the record "was the fair way to deal with the situation."[281]  This was not the correct procedure and Reyes Trial Counsel should have objected to the presentation of the September 17th letter.

Rather than present to the Trial Court an argument that Reyes' statement was not completely inaccurate, Reyes Trial Counsel abandoned their client on this point.  Moreover, and perhaps more importantly, Reyes Trial Counsel should have argued that the remedy for the State was to cross-examine Reyes.  The State

---

[278] *Burns*, 76 A.3d at 790.
[279] *Id*.
[280] Penalty Phase Tr. Oct. 25, 2001 at 143:13–14.
[281] *Id.* at 106:9–10.

concedes, as it must, that Reyes Trial Counsel could have insisted that Reyes be cross-examined.[282] Had that cross-examination taken place, Reyes could have explained Reyes' understanding of the options that were explained to him.

This Court finds, at a minimum, Reyes Trial Counsel should have objected to the reading of the September 17th letter because it contained the personal beliefs and opinions of the prosecutors. Indeed, the letter expressly said that "we believe" (the State) that the death penalty was absolutely required. Accordingly, Reyes Trial Counsel acted objectively unreasonable with respect to the State's challenge to Reyes' allocution, the subsequent "curative measure," and the improper vouching within the September 17th letter. Furthermore, Reyes suffered prejudice as a result of the State's improper vouching. Accordingly, this Court finds that Reyes has satisfied both the performance and prejudice prongs of *Strickland*.

## VI. WHETHER REYES IS ENTITLED TO RELIEF ON HIS GENERAL CONSTITUTIONAL OBJECTIONS TO DELAWARE'S EXECUTION DRUGS IS AN ISSUE RESERVED FOR THE APPELLATE COURT.

Reyes argues that this Court must vacate his death sentence because, in light of a nationwide shortage of lethal injection drugs, the state of Delaware cannot administer the death penalty in a manner consistent with Reyes' constitutional rights against cruel and unusual punishment.

---

[282] State's Answer to Reyes' Brief Following Ev. Hrg., Oct. 8, 2014, p. 60 ("While [Reyes] is correct that rather than agreeing to let the State read the accurate letter into the record, [Reyes Trial Counsel] could have insisted that [Reyes] be placed under oath and cross-examined to his detriment on the issue . . .").

The protocol in Delaware for administering execution via lethal injection is described as:

> Punishment of death shall, in all cases, be inflicted by intravenous injection of a substance or substances in a lethal quantity sufficient to cause death and until such person sentenced to death is dead, and such execution procedure shall be determined and supervised by the Commissioner of the Department of Correction.[283]

The Delaware Supreme Court has consistently upheld the constitutionality of the Delaware Death Statute.[284] The Delaware Supreme Court has upheld the constitutionality of the Delaware Death Statute as applied to Reyes.[285] Moreover, lethal injection as a form of execution does not violate the United States Constitution or the Delaware Constitution.[286]

The determination of whether the application of Delaware's Death Statute is unconstitutional because of an alleged national lethal injection drug shortage is not

---

[283] 11 *Del. C.* § 4209(f).

[284] *See e.g.*, *Swan v. State*, 820 A.2d 342 (Del. 2003) (holding that a jury's conviction of a defendant unanimously and beyond a reasonable doubt for a crime that itself established a statutory aggravating circumstance satisfied the constitutional requirements set forth in *Ring v. Arizona*, 536 U.S. 584 (2002), by providing a determination of the actor that rendered the defendant "death eligible"); *Brice v. State*, 815 A.2d 314 (Del. 2003) (upholding the 2002 version of 11 *Del. C.* § 4209, noting that "[t]he 2002 Statute transformed the jury's role . . . from one that was advisory under the 1991 version . . . into one that is now determinative as to the existence of any statutory aggravating circumstances."); *Ortiz v. State*, 869 A.2d 285, 305 (Del. 2005) (stating that the Delaware Supreme Court "adhere[s] to [its] holding in *Brice* that Delaware's hybrid form of sentencing, allowing the jury to find the defendant death eligible and then allowing a judge to impose the death penalty once the defendant is found to be death eligible, is not contrary to the Sixth Amendment of the United States Constitution[.]"); *Cabrera Direct Appeal*, 840 A.2d at 1272–74.

[285] *Reyes Direct Appeal*, 819 A.2d at 316–17.

[286] *State v. Deputy*, 644 A.2d 411, 420-22 (Del. Super.) *aff'd*, 648 A.2d 423 (Del. 1994).

for this Court to decide.  To the extent that Reyes needs to reserve this argument for further proceedings, it is so reserved.

## VII. <u>CONCLUSION</u>

This Court has determined that Reyes' constitutional rights were violated during the guilt and penalty phases of the Reyes Rockford Park Trial.  Moreover, Reyes Trial Counsel was ineffective.  The cumulative effect of Reyes Trial Counsel's errors leads this Court to conclude that "mistakes were made that undermine the confidence in the fairness of the [Reyes Rockford Park T]rial" and "there is a reasonable probability that the outcome of the [Reyes Rockford Park] [T]rial would have been different without the errors."[287]  Based on the record before the Court and consideration of decisional law, this Court finds that the fundamental legality, reliability, integrity, and fairness of the proceedings leading to Reyes' convictions and sentencing are not sound.  Accordingly, the judgments of convictions and death sentenced imposed by Order dated March 14, 2002 must be vacated.

---

[287] *Starling*,  2015 WL 8758197, at *2.

90

NOW, THEREFORE, this 27th day of January, 2016, the Postconviction Motion of Luis Reyes is GRANTED. The judgments of conviction and death sentence imposed by Order dated March 14, 2002 are hereby VACATED.

IT IS SO ORDERED.

*Andrea L. Rocanelli*

_____
**The Honorable Andrea L. Rocanelli**